1  **ELLIS M. JOHNSTON**
   California State Bar No. 223664
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California  92101-5030
   Telephone:  (619) 234-8467
4  Email: ellis_johnston@fd.org

5  Attorneys for Mr. Ramirez

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE THOMAS J. WHELAN)**

11  UNITED STATES OF AMERICA,              ) Case No. 07CR2531-TJW
                                           )
12                                         )
                                           )
13  v.                                     )
                                           )
14  ALFREDO ENRIQUE RAMIREZ-AYALA,         ) STATEMENT OF FACTS AND  MEMORANDUM
                                           ) OF POINTS AND AUTHORITIES IN SUPPORT
15              Defendant.                  ) OF MOTIONS
                                           )
16  _____)

17                            **I.**

18                    **STATEMENT OF FACTS**[1]

19          Around 3:00 pm on September 1, 2007, a burgundy Ford Explorer rolled over on a tight turn on State

20  Route 94 near Potrero, California.  Several of the people in the vehicle suffered multiple injuries.  In fact, two

21  of them, the drug-addled driver and one of the passengers, died as a result of injuries to their heads.[2]  The rest

22  of the passengers, ten in total, were taken to a local hospital that same afternoon.  Border Patrol agents at the

23  scene determined that none of the individuals in the vehicle had permission to be in the United States and

24  decided to process the case for alien smuggling charges.

25  _____

26          [1] The Statement Of Facts derives primarily from government reports in this case.  Mr. Ramirez reserves

27  the right to take a position contrary to the Statement Of Facts at the motions hearing and at trial.

28          [2]Autopsy reports confirmed that the driver had been under the influence of methamphetamine at the
    time of the incident.  He also had traces of alcohol in his blood as well.

                               1

1    At 1:35 am on September 2, 2007, all but three of the passengers were released from the hospital and

2    taken to the El Cajon border patrol station.  Mr. Ramirez remained at the hospital in a coma with severe head

3    trauma.  Four of those passengers who were taken back to the border patrol station were interviewed by border

4    patrol agents on September 4, 2007.  Each of those individuals were shown a set of numbered Polaroid

5    pictures of all of the survivors of the crash.  See Exhibit A (set of photographs shown to material witnesses).

6    None of the pictures were of other people uninvolved with the alleged offense.  All of the people in the

7    pictures had a completely different physical appearance, and the two pictures of Mr. Ramirez, numbered "6,"

8    showed him in a hospital bed hooked up to a respirator, a neck brace, and other medical equipment.  With

9    varying degrees of certainty, these four individuals identified the photographs of Mr. Ramirez as one of the

10   people who helped guide them across the border.  These individuals–Gilberto Ortega-Paredes, Otoniel

11   Mendoza-Arreola, Jose Maria Hueso-Luna, and Carlos Sambrano-Perez, were retained as material witnesses

12   in the prosecution of Mr. Ramirez.

13   Three of the passengers who were taken to the border patrol station at the same time as the above-

14   mentioned material witnesses were also interviewed.  At least on of them, Margarita Garcia-Candida, was able

15   to identify another individual as a footguide, but she was unable to say that Mr. Ramirez was one of the

16   guides.  See Exhibit B (contemporaneous notes of agent interviewing Ms. Garcia).  And another one of those

17   passengers, Guadalupe Zambrano-Perez, stated that there was possibly two footguides, but she did not identify

18   Mr. Ramirez as one of them.  Both of these witnesses, along with another, Juvenal Martinez-Pacheco, were

19   returned to Mexico no later than September 6, 2007.

20   During this entire time, Mr. Ramirez remained confined at the Scripps Mercy Hospital in San Diego.

21   On October 2, 2007, more than a month after the accident and after several witnesses had identified

22   Mr. Ramirez as an alien smuggler, was discharged from the hospital.  Mr. Ramirez had been comatose during

23   his tenure at the hospital suffering from severe head trauma.  Upon his release, Mr. Ramirez was not taken

24   before a magistrate or appointed counsel.  Instead he was transported to the Chula Vista border patrol station.

25   He was first questioned about his immigration status without Miranda warnings.  Mr. Ramirez was later asked

26   if he had taken any medications that day.  He advised agents that he had been given six pills, four of which

27   he did not know their name or what they were for.  Mr. Ramirez was then questioned about the circumstances

28   surrounding his arrest at the accident scene.

1    A day later, on October 3, 2007, a criminal complaint was signed by a federal magistrate against

2    Mr. Ramirez charging him with bringing three aliens into the United States without presentation.  A week

3    later, Mr. Ramirez was indicted for bringing in aliens resulting in death, transporting illegal aliens, and

4    bringing in aliens for financial gain, all in violation of 8 U.S.C. § 1324.  Mr. Ramirez pled not guilty and these

5    motions follow.

6    **II.**

7    **THIS COURT SHOULD ORDER PRESERVATION OF EVIDENCE.**

8    Defendant requests the preservation of all physical evidence in this case.  This includes any evidence

9    that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government (or its

10   private contractors) in this case.  United States v. Riley, 189 F.3d 802, 806-808 (9th Cir.1999).  This request

11   includes, but is not limited to: (1) the vehicle in this case and its parts and all of its contents; (2) the results

12   of any fingerprint analysis; (3) the defendant's personal effects; (4) the agents' rough notes; (5) any radio

13   broadcast, if it is recorded; (5) any evidence seized from the defendant or any third party (i.e., material

14   witnesses, co-defendants); and (6) any tapes of witness interviews or interrogations.  This request also

15   includes any material or percipient witnesses who might be deported or otherwise likely to become

16   unavailable (e.g. undocumented aliens and transients).  Defendant requests that government counsel be

17   ordered to notify the agencies and private contractors with custody of such evidence of the Court's

18   preservation order.

19   A proposed order has been attached for the convenience of the Court.

20   **III.**

21   **THIS COURT SHOULD COMPEL DISCOVERY.**

22   Mr. Ramirez moves for the production by the government of the following discovery.  This request

23   is not limited to those items about which the prosecutor knows, but includes all discovery listed below that

24   is in the custody, control, care, or knowledge of any government agency.  See generally Kyles v. Whitley, 514

25   U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).  To date, the defendant has received

26   924 pages of discovery.  Pertinent portions of the discovery is redacted, including the contact information for

27   the material witnesses and their families.  Mr. Ramirez requests that the government provide the home

28

addresses and phone numbers it has for all witnesses in this case.  Mr. Ramirez has also received a copy of two videotapes of the material witnesses' statements.

**1.     The Defendant's Statements.**  The Government must disclose to the defendant <u>all</u> copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any <u>Miranda</u> warnings which may have been given to the defendant; and any other statements by the defendant.  Fed. R. Crim. P. 16(a)(1)(A).  The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

**2.     Arrest Reports, Notes and Dispatch Tapes.**  The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced <u>in their entirety</u>, be turned over to him.  This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained.  This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See also</u> <u>Loux v. United States</u>, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(B) and 16(a)(1)(C), Fed. R. Crim. P. 26.2 and 12(i).  Preservation of rough notes is requested, whether or not the government deems them discoverable.

**3.     Brady Material.**  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

**4.     Any Information That May Result in a Lower Sentence.**  As discussed above, any information which may result in a more favorable sentence must also be disclosed pursuant to <u>Brady v.</u>

Maryland, 373 U.S. 83 (1963).  The Government must disclose any cooperation or attempted cooperation by the defendant, as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  Also included in this request is any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, or any other application of the Guidelines.

**5.    The Defendant's Prior Record.**  Evidence of a prior record is available under Fed. R. Crim. P. 16(a)(1)(B).  Counsel specifically requests a complete copy of any criminal record.

**6.    Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

This includes any "TECS" records (records of prior border crossings) that the Government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial.  United States v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

The defendant requests that such notice be given three weeks before trial to give the defense time to adequately investigate and prepare for trial.

**7.    Evidence Seized.** Physical evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

**8.    Henthorn Material.**  The defendant requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others

acting on the government's behalf in the case, including the police"); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991). This request includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended. The defendant further requests production of any such information at least one week prior to the motion hearing and two weeks prior to trial. If the prosecutor is uncertain whether certain information should be disclosed pursuant to this request, this information should be produced to the Court in advance of the motion hearing and the trial for an <u>in</u> <u>camera</u> inspection.

**9.** **Tangible Objects.** The defendant requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(E). Specifically, the defendant requests copies of all photographs in the government's possession of the alleged compartment.

**10.** **Expert Witnesses.** The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G). This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s). <u>See</u> <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects). This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that she understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with the defendant or any other witness.

The defense requests the notice of expert testimony be provided at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing in advance of trial to determine the admissibility of qualifications of any expert. <u>See</u> <u>Kumho v. Carmichael Tire</u>

Co., 526 U.S. 137, 119 S.Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings")

**11.    Impeachment evidence.**    The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant. See Fed. R. Evid. 608, 609 and 613. Such evidence is discoverable under Brady v. Maryland, supra. See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility). **Specifically, Defendant requests disclosure of the immigration file of the material witnesses and the co-defendant.**    The immigration files show that these witnesses have past history of immigration offenses, which not only impeaches these witnesses, but it shows that they have a pattern of illegal entry and contacts with other alien smugglers.

**12.    Evidence of Criminal Investigation of Any Government Witness.** The defense requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct. United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

**13.    Evidence of Bias or Motive to Lie.**    The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony. Pennsylvania v. Ritchie, 480 U.S. 39 (1987); United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988).

**14.    Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.**    The defendant requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

**15.    Witness Addresses**.    The defense requests the name and last known address of each prospective government witness. See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective);

United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses).  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness. United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

**16.    Name of Witnesses Favorable to the Defendant.** The defendant requests the name of any witness who made any arguably favorable statement concerning the defendant or who could not identify her or who was unsure of her identity, or participation in the crime charged.  Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d 1164,1168 (6th Cir.1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086 (1980).

**17.    Statements Relevant to the Defense.** The defendant requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert.  United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982).  This includes Grand Jury transcripts which are relevant to the defense motion to dismiss the indictment.

**18.    Jencks Act Material.** The defendant requests production in advance of the motion hearing or trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.   A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow the defendant to investigate the Jencks material. Defendant requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

**19.    Giglio Information.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange

for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

**20.    Agreements Between the Government and Witnesses**.  The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

**21.    Informants and Cooperating Witnesses.**  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against the defendant.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

**22.    Bias by Informants or Cooperating Witnesses.**  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States, 405 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

**23.    Personnel Records of Government Officers Involved in the Arrest.**  Defendant requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of Defendant.  See Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents, defense counsel will be unable to procure them from any other source.

**24.    Training of Relevant Law Enforcement Officers.**  Defendant requests copies of all written, videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case (Border Patrol, INS, Homeland Security, etc.) to their employees regarding:

1  (a) procedures concerning the detention and hospitalization of injured suspects and witnesses; (b) the

2  questioning of suspects and witnesses, including any policies concerning the recording of any statements

3  made; (c) the informing of suspects of their Constitutional rights; and (d) the procedures concerning the use

4  of photographic line ups or other identification procedures.

5       **25.    Opportunity to View and Photograph the Evidence Seized.**  Defendant hereby requests an

6  opportunity to view and photograph any evidence allegedly confiscated in this case.

7       **26.    Residual Request.**  The defense intends by this discovery motion to invoke his rights to

8  discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

9  and laws of the United States.  This request specifically includes all subsections of Rule 16.  The defendant

10  requests that the government provide him and his attorney with the above requested material sufficiently in

11  advance of trial.

12                                                        **IV.**

13  **THE COURT SHOULD DISMISS COUNTS 1, 3, 6, 9, 12, AND 15 OF THE INDICTMENT**
    **BECAUSE THEY CHARGE AIDING AND ABETTING, BUT DO NOT ALLEGE**
14  **SPECIFIC INTENT TO FACILITATE THE COMMISSION OF A CRIME BY ANOTHER.**
    **IN ADDITION, ALL COUNTS ARE DUPLICITOUS.**

15

16       Counts 1, 3, 6, 9, 12, and 15 of the indictment proceed on an aiding and abetting theory.  However,

17  none charge the necessary *mens rea* for aiding and abetting.  Accordingly, all those counts must be dismissed.

18  Count One is deficient for failure to allege the requisite knowledge and it should be dismissed.  None of the

19  counts provide the notice required by the Fifth and Sixth Amendments and they should be dismissed for that

20  reason.  Furthermore, because each count alleges aiding and abetting, the substantive offense, and an attempt,

21  all are duplicitous, and should be dismissed for that reason.

22  **A.    Failure To Charge Proper *Mens Rea*.**

23       The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise

24  infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."  Consistent with this

25  Constitutional requirement, the Supreme Court has held that an indictment must "fully, directly, and

26  expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense

27  intended to be punished."  United States v. Carll, 105 U.S. 611, 612-13  (1881) (emphasis added).  It is black

28  letter law that an indictment that does not allege an element of an offense, even an implied element, is

1  defective.  See, e.g., Russell v. United States, 369 U.S. 749 (1962); Stirone v. United States, 361 U.S. 212

2  (1960); United States v. Du Bo, 186 F.3d 1177 (9th Cir. 1999); United States v. Keith, 605 F.2d 462 (9th Cir.

3  1979).

4        The Ninth Circuit has held that "circuit law is clear that aiding and abetting contains an additional

5  element of specific intent, beyond the mental state required by the principal crime."   United States v.

6  Sayetsitty, 107 F.3d 1405, 1412 (9th Cir. 1997).  Thus, the "elements necessary to convict an individual under

7  an aiding and abetting theory are (1) that the accused had the specific intent to facilitate the commission of

8  a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that

9  the accused assisted or participated in the commission of the underlying offense, and (4) that someone

10  committed the underlying substantive offense." United States v. Gaskins, 849 F.2d 454, 459 (9th Cir. 1988)

11  (emphasis added).  "It is the aider and abettor's state of mind, rather than the state of mind of the principal,

12  that determines the former's liability." United States v. Short, 493 F.2d 1170, 1172, modified, 500 F.2d 676

13  (9th Cir. 1974).  Given that the Ninth Circuit has held that "the specific intent to facilitate the commission of

14  a crime by another" is an element of aiding and abetting, Gaskins, 849 F.2d at 459, it must be charged in the

15  indictment:  "If an element is necessary to convict, it is also necessary to indict, because elements of a crime

16  do not change as criminal proceedings progress." United States v. Hill, 279 F.3d 731, 741 (9th Cir. 2002).

17        Because none of these counts charge the specific intent to facilitate the commission of the substantive

18  offense, they must be dismissed.

19  **B.    Duplicity.**

20        The Ninth Circuit's holding in United States v. Ramirez-Martinez, 273 F.3d 903, 914-15 (9th Cir.

21  2001), overruled on other grounds by United States v. Lopez, 484 F.3d 1186 (9th Cir. 2007)reveals that all

22  of the counts are duplicitous.  In that case, the Court held that it was improper to charge completed §1324

23  transportation and attempted transportation in the same count. Id. at 914-15. The Court noted that completed

24  transportation is a general intent crime, and an attempt is a specific intent crime.  Because the *mens rea* for

25  general and specific intent crimes are different, they contain different elements, thus are different offenses and

26  may not be charged in the same count of the indictment.

27        Here, the situation is directly analogous with respect to the §1324(a)(1)(A)(ii) transport offense, and

28  the §1324(a)(2) "bring to" offenses.  All counts contain a general intent *mens rea*, "knowing or reckless

1  disregard," yet both also allege aiding and abetting, and attempt, which require specific intent.  While not as

2  directly analogous to <u>Ramirez-Martinez</u>, the situation with the §1324(a)(1)(A)(i) "bring to" count also requires

3  dismissal because the knowledge *mens rea* in the statute is different than specifically intending to see the

4  substantive offense committed or the intent to commit an attempt.  Accordingly, all of those counts are

5  duplicitous, and should be dismissed.

6  **V.**

7  **SECTION 1324 OF TITLE 8 OF THE UNITED STATES CODE VIOLATES THE FIFTH AND**

8  **SIXTH AMENDMENTS TO THE CONSTITUTION BECAUSE CONGRESS IMPERMISSIBLY**
   **STRUCTURED THE STATUTE SO THAT A JUDGE, RATHER THAN A JURY, DECIDES**
   **KEY FACTS THAT DETERMINE THE STATUTORY MAXIMUM PENALTIES**

9

10  Congress intentionally structured 8 U.S.C. §1324 such that a trial judge, rather than a jury, determines

11  the statutory maximum penalties for §1324 offenses by finding factors such as whether the offense was

12  committed for profit, or whether a death resulted.  Based on the reasoning in the Supreme Court's opinion in

13  <u>Apprendi</u>, this statutory structure violates the Fifth and Sixth Amendments to the Constitution.  Because there

14  is no ambiguity in this regard, the statute cannot be saved by employing the doctrine of constitutional doubt.

15  Moreover, this Court does not have the authority to construe the statute in a constitutionally inoffensive

16  manner.  Accordingly, section 1324 is facially unconstitutional.

17  This issue is arguably foreclosed by the Ninth Circuit's opinion in <u>United States v. Matus-Leva</u>, 311

18  F.3d 1214, 1217 (9th Cir. 2002), even though that opinion badly mischaracterized the argument presented in

19  that case, and undertook only the most superficial analysis of it.  The Opinion reveals the weakness of its

20  analysis by claiming that Matus-Leva's argument is "wholly without merit," <u>id.</u> at 1217, yet overlooks the fact

21  that  in his dissent in <u>Jones v. United States</u>, 526 U.S. 227 (1999), Justice Kennedy, joined by Chief Justice

22  Rehnquist and Justices O'Connor and Breyer, specifically agreed with Matus-Leva's construction of §1324.

23  In <u>Jones</u>, the Court was addressing whether the bodily injury and resulting in death provisions in the

24  federal car-jacking statute were elements or sentencing factors.  Despite the fact that the intent of Congress

25  in this respect was much less clear from the plain language of the car-jacking statute than it is with

26  §1324(a)(1), the dissenters believed that the bodily injury and death resulting provisions of the car-jacking

27  statute were clearly sentencing provisions.  In support of this, the dissent analogized to §1324(a)(1), noting

28  that §1324(a)(1)(A) sets out elements of the offense, and §1324(a)(1)(B) sets out sentencing factors: "in one

1  established statutory model, Congress defines the elements of an offense in an initial paragraph ending with

2  the phrase 'shall be punished as provided in' a separate subsection.  The subsection provides for <u>graded</u>

3  <u>sentencing ranges, predicated upon specific findings (such as serious bodily injury or death)</u>.  See, e.g., <u>8</u>

4  <u>U.S.C. §1324(a)(1)</u>."  <u>Id.</u> at 258 (emphasis added).  Thus, the four dissenters in <u>Jones</u> specifically recognized

5  that §1324(a)(1)(A) sets out elements of the offenses therein, and §1324(a)(1)(B) sets out sentencing factors.

6      Nevertheless, this Court is arguably bound by <u>Matus-Leva</u>; the issue is set out here to preserve it for

7  later appeal.  If the Court would like further briefing on this issue, defense counsel will provide it.

8                                                      **VI.**

9  **IF THE COURT CHOOSES TO CONSTRUE §1324 IN SUCH A WAY THAT THE**
10 **"SENTENCING FACTORS"THEREIN ARE NOW OFFENSE ELEMENTS, THEN THE**
   **COURT MUST APPLY A *MENS REA* TO THOSE FACTORS**

11     If §1324 is to be "re-written" such that the sentencing factors therein are elements of the offenses a

12 simple change in nomenclature is not all that occurs.  Rather, the *mens rea* requirements for the various §1324

13 offenses must then attach to those sentencing factors.  If the Court applies a *mens rea* to those factors, then

14 it must dismiss all counts of the indictment that charged those factors without alleging any *mens rea*.

15     Again, this argument is likely precluded by <u>Matus-Leva</u>, 311 F.3d at 1218-19.  However, the panel

16 in that case did not address the broad *mens rea* argument raised in that case, and herein – <u>Matus-Leva</u> only

17 addressed the *mens rea* argument as it related to the death resulting issues.  Nevertheless, the Court has seen

18 such briefing countless times before; for the sake of brevity, defense counsel will not include it herein, but

19 will provide it if so requested.  The argument is mainly being set out here to preserve it for later appeal.

20                                                     **VII.**

21 **IF THERE IS NO MENS REA REQUIREMENT WITH RESPECT TO THE DEATH**
   **RESULTING FACTOR IN 8 U.S.C. §1324(a)(1)(B)(iv), THAT PORTION OF THE STATUTE IS**
22 **UNCONSTITUTIONALLY DISPROPORTIONATE AND VAGUE**

23 **A.    If There Is No Mens Rea Attached To The Death Resulting Factor In §1324(a)(1)(B)(iv),**
   **That Provision Is Unconstitutionally Disproportionate.**
24

25     If this Court rejects the arguments above and construes the death resulting language in

26 §1324(a)(1)(B)(iv) as not requiring any showing of *mens rea*, that portion of the statute is unconstitutional

27 because it authorizes the death penalty for conduct that does not satisfy the minimum *mens rea* requirement

28 for imposition of the death penalty – reckless indifference to human life in the course of committing a violent

1  felony.  That is, that portion of the statute is unconstitutionally disproportionate, in violation of the Eighth

2  Amendment.  The <u>Matus-Leva</u> opinion does not address the proportionality issue.  <u>See</u> <u>Matus-Leva</u>, 311 F.3d

3  at 1218 n.3.

4       In <u>United States v. Cheely</u>, 36 F.3d 1439 (9th Cir. 1994), the Ninth Circuit addressed a similar issue.

5  The defendants were charged with sending a mail bomb, with death resulting, in violation of 18 U.S.C. §§

6  844(d) and 1716(d).  The Court noted that the statute, as written, did "not require that the defendant's behavior

7  be reckless, that the accident be reasonably foreseeable, or that the defendant even know that the material is

8  capable of exploding."  <u>Id.</u> at 1443 n.8.  Thus, the statutes "authorize[d] the death penalty not only for persons

9  who murder by means of mail bomb, but also for a much broader class of less culpable persons. . . .  [T]hey

10  are broad enough to authorize death for persons guilty of no more than involuntary manslaughter."  <u>Id.</u> at

11  1433.

12       The Ninth Circuit went on to note that this scenario raised two constitutional problems.  First, "in such

13  circumstances, the death penalty would be disproportionately severe," as the "*least* culpable mental state the

14  Supreme Court has held death-eligible is reckless indifference to human life in commission of a felony."  <u>Id.</u>

15  at 1439 & n.9 (citing <u>Tison v. Arizona</u>, 481 U.S. 137, 157-58 (1987)).[3]  Second, because the statutes

16  encompassed a broad class of death-eligible defendants, the result could be "wanton" and "freakish"

17  sentencing disparities of the kind prohibited by the Supreme Court in <u>Furman v. Georgia</u>, 408 U.S. 238

18  (1972).  Accordingly, the Court held that the statutory provisions in that case were unconstitutional because

19  they did not genuinely narrow the class of persons eligible for the death penalty.[4]  <u>Id.</u> at 1446.

20  _____

21      [3]    The government may argue that the offense here is tantamount to felony murder, and thus no *mens rea* need

22  be alleged or shown.  However, the felony murder rule requires a *mens rea* with respect to the resulting death – reckless indifference to human life.  <u>See</u> <u>Tison</u>, 481 U.S. at 155-58.  Moreover, with limited exceptions (espionage and treason), the felony murder rule only applies to violent felonies.  <u>See</u> 18 U.S.C.

23  §1111; 18 U.S.C. §3591 (indicating that death sentence may only be imposed in felony murder situation if defendant engaged in act of violence with reckless disregard for human life); <u>Schad v. Arizona</u>, 501 U.S.

24  624, 640 (1991) (common law felony murder applies to violent felonies, generally robbery).  Alien smuggling is not a violent felony.  Finally, Congress added death resulting language to over forty statutes

25  in 1994, including defacing religious property under 18 U.S.C. §247.  It is hard to believe that Congress intended to create several new, specific felony murder offenses, even for such minor offenses as 18 U.S.C.

26  §247, especially given the codification of the felony murder rule in 18 U.S.C. §1111.

27      [4]    Justice Thomas made a similar point in his concurrence in <u>Apprendi</u>:  "in the area of capital punishment,

28  unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment – we have restricted the legislature's ability to define crimes.  Under our recent capital-punishment jurisprudence, [no jurisdiction] could provide . . . that a person shall be death

1    The Sixth Circuit arrived at a similar holding in United States v. Rebmann, 226 F.3d 521, 524 (6th

2    Cir. 2000), overruled on other grounds, United States v. Leachman, 309 F.3d 377 (6th Cir. 2002).  In that case,

3    the defendant pled guilty to distribution of heroin in violation of 21 U.S.C. § 841(a)(1), which has a maximum

4    sentence of twenty years.  However, the district court found that the defendant's ex-husband's death resulted

5    from the heroin distribution, and consequently her maximum sentence was increased to life.  In reversing that

6    sentence following Apprendi, the Sixth Circuit noted the incongruity of subjecting a defendant to a potential

7    life term based on death resulting regardless of the defendant's intent with respect to that death:

8        [I]t would indeed require a casual approach to the trial rights afforded defendants under our
         Constitution if this court were to allow a trial court to determine that a defendant who pled

9        guilty merely to the physical distribution of a drug (with a corresponding sentence of less than
         20 years) is subject to a sentence of up to life imprisonment because the court believed, only

10       by a preponderance of the evidence, that death resulted from that crime regardless of the
         defendant's intent to harm.

11   Id. at 525 (emphasis added).  The concern about subjecting a defendant to life imprisonment based on a death

12   resulting for which the defendant had no intent is dramatically heightened when a defendant is subject to a

13   death sentence under similar circumstances.[5]

14       The government may respond that it is nonetheless acceptable to make a defendant death eligible,

15   regardless of his mental state surrounding the fact that makes him death eligible, so long as the defendant's

16   mental state is taken into account in the death penalty sentencing phase; i.e., the jury can sort out whether a

17   defendant had the constitutionally required *mens rea* at the sentencing phase.  There is no precedent for such

18   a capital crimes system,[6] and it would indeed be "cruel and unusual" to subject a defendant who utterly lacked

---

eligible automatically upon conviction for certain crimes."  Apprendi, 530 U.S. at 523 (Thomas, J, concurring).  Here, if there is no *mens rea* requirement with respect to §1324(a)(1) offenses, then a defendant may be automatically death eligible based on the fortuity of whether someone dies during the offense, regardless of whether that death has anything to do with the defendant's conduct or intentions.  This is essentially the position the government has taken in the past.

[5]    Interestingly, in a pre-Apprendi opinion, the Eleventh Circuit held that the death resulting factor in the car-jacking statute was a sentencing factor, not an element, but that court nevertheless noticed the importance of taking a special approach in capital cases:  "the district court is required to send to the jury the question of whether death resulted in one instance – when the government seeks capital punishment."  United States v. Williams, 51 F.3d 1004, 1010 n.5 (11th Cir. 1995).

[6]    Actually, there is precedent *against* such a system.  A post-conviction *mens rea* requirement would nonetheless be subject to the protections contained in Apprendi.  See generally Ring v. Arizona, 536 U.S. 584 (2002).  In addition to the right to a jury finding, and the beyond a reasonable doubt standard, Apprendi also requires that the government comply with the Fifth Amendment grand jury right and the Sixth Amendment right to notice.  See United States v. Rodriguez-Gonzalez, 358 F.3d 1156 (9th Cir. 2004)

1  a *mens rea* with respect to a death to such an ordeal.  The Supreme Court has never approved an execution

2  where the underlying capital conviction did not involve a homicide at all, and has essentially held that the

3  death penalty is disproportionate in cases other than murder.  See, e.g., Coker v. Georgia, 433 U.S. 584 (1977)

4  (death penalty disproportionate for rape).  Indeed, the assumption that conviction for some form of murder

5  is a required predicate for any death penalty sentencing proceeding is inherent in Supreme Court precedent.

6  See, e.g., Tuilaepa v. California, 512 U.S. 967, 971-72 (1994) (equating "a crime for which the death penalty

7  is a proportionate penalty" with "a homicide case").

8  **B.  If There Is No Mens Rea Attached To The Death Resulting Factor In §1324(a)(1)(B)(iv),**
   **That Provision Is Unconstitutionally Vague.**

9

10  If there is no *mens rea* with respect to the death resulting factor, then the statute is also

11  unconstitutionally vague.  The void-for-vagueness doctrine requires that a statute "define the criminal offense

12  with sufficient definiteness that ordinary people can understand what conduct is prohibited."  Kolender v.

13  Lawson, 461 U.S. 352, 357 (1983).  The Supreme Court has long recognized that "the constitutionality of a

14  vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."

15  Colautti v. Franklin, 439 U.S. 379, 395 (1979).

16  Based on the government's past interpretation of the death resulting provision in §1324(a)(1)(B)(iv),

17  a defendant could be subjected to life imprisonment or death if a person he is smuggling is hit by a bolt of

18  lightning.  Surely no rational person would think that was the meaning of this statute.

19  The Fifth Circuit was confronted with a similar problem in United States v. Hayes, 589 F.2d 811 (5th

20  Cir. 1979).  The defendant in that case, a police officer, was convicted for violating an individuals' civil rights

21  under color of law, 18 U.S.C. §242, which permitted a life sentence "if death results."  The court in that case

22  first held that the death resulting provision did not require that the defendant intended the death to result.  In

23  response to the defendant's vagueness argument, the court held that a "fundamental principle of criminal law

24  is that a person is held responsible for all consequences proximately caused by his criminal conduct.  Thus,

25  where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation

26  is unbroken and the perpetrator is held criminally responsible for the resulting harm."  Id. at 821.  The court

27

28  (finding that maximum sentence could not be increased due to failure to allege the enhancing fact in the
charging document).  Because the indictment here does not allege the constitutionally required *mens rea*,
Rodriguez-Gonzalez precludes enhancement.

1  went on to state that if a person is struck by lightning while an officer is violating that person's civil rights,

2  there is no foreseeabilty of that event (nor deterrence value in punishing that event), and thus there is no

3  criminal liability.  Thus, the court essentially held that the death resulting language in that statute required a

4  showing of negligence.  Here, the government does not even go that far.

5        Thus, the Fifth Circuit in <u>Hayes</u> recognized the vagueness problem, and at least found a way around

6  it.  The problem with employing the Fifth Circuit's approach is that it is unprecedented to attach a negligence

7  *mens rea* to a fact that makes a defendant eligible for the death penalty.  If this Court were inclined to imply

8  a *mens rea* in an effort to save that portion of the statute, it would be sensible to at least imply a *mens rea* that

9  satisfies minimum constitutional proportionality standards; *i.e.*, reckless indifference to human life.  If this

10  Court chooses to take that approach, the resulting in death charge must be dismissed because the *mens rea*

11  was not pled in the indictment.

12        Again, this issue is arguably precluded by <u>Matus-Leva</u>, 311 F.3d at 1219.  It is being set out here

13  mostly to preserve it for later appeal.  It is set out in somewhat greater detail than other items cited to be

14  preserved because of its interplay with the proportionality argument (which was not decided in <u>Matus-Leva</u>,

15  311 F.3d at 1218 n.3).

16  **VIII.**

17  **SEVERAL COUNTS MUST BE DISMISSED BECAUSE CONGRESS<br>DID NOT INTEND AIDING AND ABETTING LIABILITY UNDER §1324(a)(2)**

18

19        It is clear, for numerous reasons, that Congress did not intend aiding and abetting liability to attach

20  to offenses under 8 U.S.C. §1324(a)(2).  Thus, the counts that so charge should be dismissed.  However, this

21  issue is precluded at this level by <u>United States v. Angwin</u>, 271 F.3d 786, 800-04 (9th Cir. 2001).  It is being

22  raised here to preserve it for later appeal.

23  **IX.**

24  **THIS COURT SHOULD DISMISS THE INDICTMENT<br>BECAUSE THE GOVERNMENT DEPORTED SEVERAL EYEWITNESSES.**

25

26        A total of ten people, including Mr. Ramirez, were detained on the day of his arrest.  Three of those

27  people returned to Mexico.  There is no indication that Mr. Ramirez agreed to authorize in writing or

28  otherwise the deportation of the other material witnesses.

1    The government's release and deportation of the witnesses is in violation of at least four major rights

2  of Mr. Ramirez, the exercise of which are essential to enabling him to receive a fair trial: (1) Mr. Ramirez's

3  Fifth Amendment right to Due Process; (2) his Sixth Amendment right to Compulsory Process; (3) his Sixth

4  Amendment to confront and cross-examine witnesses; and (4) his right, under <u>Brady v. Maryland</u>, to receive

5  all exculpatory evidence.  Through its release and deportation of the other eyewitnesses, the government has

6  effectively prohibited Mr. Ramirez from receiving a fair trial in this case, and as a result, the indictment must

7  be dismissed.

8  **A.    <u>Mr. Ramirez's Fifth Amendment Right to Due Process and Sixth Amendment Right to Compulsory Process Mandate that He Be Given the Right to Present Witnesses on His Own Behalf at Trial.</u>**

9

10    "Few rights are more fundamental than that of an accused to present witnesses in his own defense."

11  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973); <u>see also</u> <u>Faretta v. California</u>, 422 U.S. 806, 818 (1975);

12  <u>United States v. Nixon</u>, 418 U.S. 683, 711 (1974); <u>Webb v. Texas</u>, 409 U.S. 95 (1972); <u>Washington v. Texas</u>,

13  388 U.S. 14 (1967).  As the Supreme Court explained in <u>Washington v. Texas</u>, the right to present a defense

14  by presenting one's witnesses "is a fundamental element of due process."  <u>Washington</u>, 388 U.S. at 19.

15    Thus, whenever the government causes the unavailability of some evidence which is material and

16  relevant to the defense, the government violates the defendant's right to compulsory process guaranteed by

17  the Sixth Amendment. <u>Chambers</u>, 410 U.S. at 302; <u>see also</u> <u>Nixon</u>, 418 U.S. at 683.  Consequently, if a

18  particular statute prevents a defendant from calling a witness, or previous effective cross-examination of a

19  witness, that statute has been declared unconstitutional. <u>Washington</u>, 388 U.S. at 14; <u>Chambers</u>, 410 U.S. at

20  302.

21    Actions of the government which make defense witnesses unavailable at trial violate the defendant's

22  Sixth Amendment rights to compulsory process and Fifth Amendment rights to Due Process.  The right to

23  compel the attendance of witnesses, and to offer their testimony at trial, has long been recognized to be at the

24  core of the right to present a defense. <u>Washington</u>, 388 U.S. at 19.  "In short, the right to compulsory process

25  is essential to a fair trial." <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 875 (1982) (O'Connor, J.,

26  concurring opinion).  The rights protected by the Compulsory Process Clause clearly include the right to

27  present the defendant's version of the facts to the jury so that it may decide where the truth lies.  A defendant

28  is denied this crucial right when the government makes witnesses unavailable.

1    In <u>Valenzuela-Bernal</u>, the Supreme Court held that the deportation or voluntary return of alien

2   witnesses whose testimony would be both "material and favorable" to the defense constitutes a violation of

3   the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fifth

4   Amendment. <u>Id.</u>  The Court stated that sanctions would be appropriate if the defendant "makes a plausible

5   showing that the testimony of the deported witnesses would have been material and favorable to his defense,

6   in ways not merely cumulative to the testimony of available witnesses." <u>Id.</u> at 873. It is not required that a

7   detailed description of the nature of the lost evidence be provided, but only that a "plausible showing" be

8   made that the evidence will be material and favorable. <u>Id.</u>

9    The Ninth Circuit has created a two-step analysis when dealing with deported witnesses.  <u>See</u> <u>United</u>

10  <u>States v. Velarde-Gavarrete</u>, 975 F.2d 672 (9th Cir. 1992); <u>United States v. Dring</u>, 930 F.2d 687 (9th Cir.

11  1991); <u>United States v. Armenta</u>, 69 F.3d 304 (9th Cir. 1995).  The defendant must show that: (1) the evidence

12  lost would be material and favorable to the defense; and that (2) the government acted in bad faith.  Id.  Both

13  factors are satisfied in this case.

14    **1.    <u>The testimony of the deported material witnesses would have substantially</u>**
      **<u>benefitted Mr. Ramirez's defense.</u>**

15

16    By deporting the three material witnesses, the government has effectively prevented Mr. Ramirez from

17  presenting a defense to the charges and allegations.  Mr. Ramirez will be unable to present the testimony of

18  witnesses who could potentially testify and corroborate that he was not knowingly involved in any larger alien

19  smuggling venture.  At trial, the jury will only be exposed to the testimony of three witnesses hand-picked

20  by agents of the prosecutor.  What the jury will not be exposed to as a result of the agents' successful attempts

21  to speedily whisk the other material witnesses away to Mexico is the testimony of a number of witnesses who

22  either could not identify Mr. Ramirez as a guide or affirmatively stated that he was not a foot guide.  These

23  individuals' testimony would not only support Mr. Ramirez's contention that he was not a smuggler in this

24  venture; their testimony is essential to corroborating this claim.

25    **2.    <u>The government acted in bad faith by deporting the other material witnesses</u>**.

26    Because the additional eyewitnesses were deported by the government, Mr. Ramirez is deprived of

27  testimony that is material, favorable, and not cumulative.  The testimony of the deported witnesses is crucial

28  to the analysis because there is "a reasonable likelihood that the testimony could have affected the trier of

1  fact." Valenzuela-Bernal, 458 U.S. at 874. As far as defense counsel is aware, prior to their deportations, the

2  government made no attempts to tape-record any of the exculpatory witnesses, to take a sworn statement of

3  any exculpatory witness, or to detain any exculpatory witness for deposition or trial. The fact that the

4  government nonetheless went forward and deported these people without providing Mr. Ramirez even the

5  opportunity to interview them shows its bad faith. The choice to deport the eye-witnesses in a case that

6  requires the Government to prove that Mr. Ramirez had knowledge and acted for financial gain is an act of

7  bad faith, directly compromising his due process rights.[7]

8  **B.    The Government's Deportation of the Eye-Witnesses Denies Mr. Ramirez his Right to Confront the Witnesses and Right to Due Process of Law.**

It would be a denial Mr. Ramirez's right to confrontation of the witnesses[8] and due process of law[9] if

10  this Court allows the government to call the only detained material witnesses at Mr. Ramirez's trial. The

11  Confrontation Clause serves a dual purpose: it allows the accused to test the recollection and the conscience

12  of a witness through cross-examination; and, it allows the jury to observe the process of cross-examination

13  and make an assessment of the witness' credibility. Maryland v. Craig, 497 U.S. 836, 851; Ohio v. Roberts,

14  448 U.S. 56, 63-64.

15  In a case such as this where the witness has received the benefit of the government refraining from

16  pressing criminal charges and immigration benefits (even if only temporary) in return for his testimony against

17  the accused, it is important that the jury see the reaction of the witness when confronted with the testimony

18  of other eye-witnesses. The jury will not have the ability to make such an assessment or even see a videotaped

19  deposition of these witnesses.

20  **C.    The Government's Deportation of Material Witnesses Possessing Exculpatory Information Violates _Brady v. Maryland_.**

The Constitution prohibits the prosecution from suppressing material evidence in a criminal case. In

23  Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that the suppression by the prosecution of

---

25  [7] Not only has the government removed these individuals to Mexico before defense counsel could

26  even move for their temporary retention, it has further frustrated any efforts to reach these witnesses by failing to provide any specific information in the discovery concerning their whereabouts.

27

28  [8] U.S. Const. Amend. VI.

[9] U.S. Const. Amend. V.

1  evidence favorable to an accused violates due process where the evidence is material either to guilt or to

2  punishment, irrespective of the good or bad faith of the prosecution.  373 U.S. at 87.  As the Court noted in

3  Brady, the purpose of the rule is not to punish prosecutors, but rather to ensure that the defendant receives a

4  fair trial by ensuring that the prosecutor does not assume "the role of an architect of a proceeding that does

5  not comport with the standards of justice, even though, as in the present case, her action is not 'the result of

6  guile.'"  Id. at 87-88.

7       In the present case, the government has violated the primary dictate of Brady, i.e. disclosure of

8  exculpatory material.  By deporting the additional material witnesses prior to Mr. Ramirez ever having an

9  opportunity to question them and without even interviewing them itself, the government has, in effect, barred

10  Mr. Ramirez from this exculpatory evidence. The indictment should be dismissed.

11                                                      **X.**

12  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S
    INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**

13  **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH
    AMENDMENT BY DEPRIVING MR. COTA OF THE TRADITIONAL FUNCTIONING OF THE**

14                                          **GRAND JURY**

15  **A.     Introduction.**

16       The indictment in the instant case was returned by the January 2007 grand jury.  See CR 1.[10]  That

17  grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11,

18  2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is

19  attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the

20  instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously

21  given in this district in several ways.[11]  These instructions compounded Judge Burns's erroneous instructions

22  and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately

23

24

25

26       [10]  "CR" refers to the Clerk's Record in Case Number 07cr2236-TJW.

27       [11]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
    Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
28  States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
    F.3d 1156 (9th Cir. 2002) (per curiam).

1  preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy

2  of which is attached hereto as Exhibit B.[12]

3    **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

5    After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

6  responsibility, see Ex. A at 3, 3-4, 5,[13] Judge Burns instructed the grand jurors that they were forbidden "from

7  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

8  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

9  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

10  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

11  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

12  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

13  because the grand jurors disagree with a proposed prosecution.

14    Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

15  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

16    I've gone over this with a couple of people.  You understood from the questions and answers
17    that a couple of people were excused, I think three in this case, because they could not adhere
    to the principle that I'm about to tell you.

18

19  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

20  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

21  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

22    Examination of the recently disclosed voir dire transcript, which contains additional instructions and

23  commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

24  reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

25

26  [12]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the
role of the grand jury.  Mr. Ramirez requests that the video presentation be produced.  See United States v.
27  Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the
ground rules by which the grand jury conducts those proceedings are not.").

28

[13]  See also id. at 20 ("You're all about probable cause.").

1  and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

2  merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

3  earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

4  determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime
> was committed?  And second, do we have a reasonable belief that the person that they propose
> that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to
> either of the questions is "no," then the grand jury should not hesitate and not indict.

9  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

10  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

11  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

12  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

13  crime."

14        Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

15  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

16  Because of the redactions of the grand jurors' names, Mr. Cota will refer to them by occupation.  One is a

17  retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

18  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

19  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

20  cases.  See id.

21        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.

22  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district,

23  such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he

24  provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not

25  capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
> defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
> appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled
> to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want
> you to say*, "well, yeah, there's probable cause, but I still don't like what our government is

1   doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your
2   frame of mind, the probably you shouldn't serve.  Only you can tell me that.

3   See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

4   juror know that he would not want him or her to decline to indict in an individual case where the grand juror

5   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

6   Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

7   manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

8   charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided

9   no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

10  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

11  listening to this exchange could only conclude that there was no case in which Judge Burns would permit

12  them to vote "no bill" in the face of a showing probable cause.

13       Just in case there may have been a grand juror that did not understand his or her inability to exercise

14  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

15  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

16  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

17  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

18  considerations into account.

19   Well, those things -- the consequences of your determination shouldn't concern you in the
     sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
20   cannot consider the punishment or the consequence that Congress has set for these things.
     We'd ask you to also abide by that.  We want you to make a business-like decision of whether
21   there was a probable cause. . . .

22  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

23  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

24       In response to further questioning, REA disclosed REA's belief "that drugs should be legal."  See id.

25  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

26  juror is obligated to vote to indict if there is probable cause.

27   I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
     I have to make.  But my alternative is to vote for someone different, vote for someone that
28   supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
     like it.  So I'm not going to follow it here."

1   You'd have a similar obligation as a grand juror even though you might have to grit your teeth
2   on some cases. Philosophically, if you were a member of congress, you'd vote against, for
    example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing
3   some drugs.

    That's not what your prerogative is here. You're prerogative instead is to act like a judge and
4   say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was
    committed? Yes. Does it seem to me that this person's involved? It does." *And then your*
5   *obligation, if you find those to be true, would be to vote in favor of the case going forward.*

6   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

7   questions are answered in the affirmative, lead to an "obligation" to indict.

8       Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

9   paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

10  to indict in every case in which there was probable cause.

11      The Court: Do you think you'd be inclined to let people go in drug cases even though you
            were convinced there was probable cause they committed a drug offense?
12      REA: It would depend on the case.
        The Court: Is there a chance that you would do that?
13      REA: Yes.
        The Court: I appreciate your answers. I'll excuse you at this time.
14

15  Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

16  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

17  should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

18  indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge

19  Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

20  to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to

21  indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

22  forward."[14] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict

23  was too great a risk to run.

24

---

25      [14] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge
26  will have determined the existence of probable cause "in most circumstances" before it has been presented
    with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each
27  case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
    Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court
28  "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of
    the evidence presented.

**2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[15]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."

---

[15]  These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge."  See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[16] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's

---

[16]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns's instructions.

**C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an

inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas,

408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two different meanings of the word "should" in the space of two consecutive sentences. That could not have been his intent. But even if it were, no grand jury could ever have had that understanding.[17] Jurors are not presumed to be capable of sorting through internally contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

(1)    The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a

---

[17] This argument does not turn on Mr. Cota's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)** In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

Court . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some

factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3)    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(4)    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct contradiction of the Supreme Court's decision in <u>Vasquez</u>. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. <u>Id.</u>

The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins,

J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Cota understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States

1
2

v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

3

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

4
5
6
7
8
9
10
11
12
13
14
15
16
17

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

18
19

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

20
21
22

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause.  If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

23
24
25
26
27
28

Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." <u>See</u> <u>id.</u> Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." <u>See</u> Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

//

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## XI.

## THE COURT SHOULD BIFURCATE THE TRIAL SO THAT THE DEATH RESULTING FACTOR WOULD ONLY BE PRESENTED TO A JURY IF THE JURY FINDS THE OTHER ELEMENTS OF THE CHARGED OFFENSES

Pursuant to Federal Rules of Criminal Procedure 8 and 14, Mr. Ramirez requests that the trial be bifurcated so that the death resulting factor alleged in the vast majority of counts will be presented to the jury only if the jury finds the other elements comprising the offenses charged in those counts, and only after all the other counts in the indictment have been tried.  The prejudice inherent in this context is apparent – the fact that a death occurred is extremely and unfairly prejudicial,[18] and is irrelevant to the other elements of the offenses charged.  Moreover, there would be little cost in judicial economy to bifurcate the death resulting factor.  This Court recognized as much in the Matus-Leva case.

In his concurring opinion in Apprendi, Justice Thomas stated that the common practice where a sentencing enhancement factor may be prejudicial is to "to bifurcate the trial, with the jury only considering the [factor that enhances the sentence] after it has reached a guilty verdict on the core crime." 530 U.S. at 521 n.10.  There, Justice Thomas was  addressing the situation where a prior conviction is the sentencing enhancing factor.  Presumably, if bifurcation is the common practice in such a situation, it should also be the common, and appropriate, practice when the sentencing enhancing factor/element is something as inherently prejudicial as the fact that a death resulted, particularly a death for which the defendant had no *mens rea*.  The Eleventh Circuit's decision in United States v. Williams, 51 F.3d 1004, 1010 (11th Cir. 1995) (finding that similar evidence in bifurcated trial should have been excluded but declining to reverse because the district court may not have abused its discretion under the circumstances

---

[18]    The unfairness of the prejudice is all the more clear given that the tragic death in the instant case was not the result of a high speed chase or any sort of effort to elude law enforcement.

of the case and any error was harmless), overruled on other grounds by Jones v. United States, 526 U.S. 227 (1999), supports this position.

## XII.

### MR. RAMIREZ'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE OF THE UNREASONABLE DELAY IN PRESENTING HIS WARRANTLESS ARREST TO A MAGISTRATE FOR A PROBABLE CAUSE DETERMINATION

As set out above, Mr. Ramirez was arrested on September 1, 2007, around 3:00 p.m. His arrest was not presented to a magistrate judge for a probable cause determination and arrest warrant until October 3, 2007. There was no reason for this delay, and thus all of his statements must be suppressed.

In Gerstein v. Pugh, 420 U.S. 103, 125 (1975), the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to extended detention following a warrantless arrest. Subsequently, in County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991), the Supreme Court held that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." However, the Court emphasized that delays less than 48 hours may be held unreasonable:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate Gerstein if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

McLaughlin, 500 U.S. at 56 (emphasis added). The 48-hour rule is thus not dispositive of whether a delay is reasonable. Rather, its significance is that it shifts the burden to the government "to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." Id. at 57. Here, Mr. Ramirez's case was not presented to a magistrate judge within 48 hours. It was not presented to a magistrate judge until thirty-two (32) *days* after his arrest. There is no justifiable reason for this delay. Thus, any statements should be suppressed. See id. at 1070-71 (holding that suppression is appropriate remedy for violation of Gerstein rule).

# XIII.

## THE INDICTMENT SHOULD BE  DISMISSED, OR STATEMENTS SUPPRESSED, DUE TO PRE-ARRAIGNMENT DELAY

As set out above, Mr. Ramirez was arrested around 3:00 p.m. on September 1, 2007.  He was not taken before a magistrate judge until some time on October 4, 2007, thirty-three (33) *days* after his arrest. There was no justifiable reason for this delay.

Pursuant to Federal Rule of Criminal Procedure 5(a), "an officer making an arrest . . . without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge . . . ."  "Courts look to 18 U.S.C. §3501(c) to determine whether pre-arraignment statements obtained in violation of Rule 5(a) are admissible."  United States v. Van Poyck, 77 F.3d 285, 288 (9th Cir. 1996).  Under §3501(c), if the statements were made within six hours of arrest, they will not be excluded solely because of pre-arraignment delay.  Id.  In other words, §3501(c) creates a six-hour "safe harbor" period that immunizes the admissibility of the statements from an attack based on pre-arraignment delay.  Id.  Mr. Ramirez's statements on February 2, 2004 and February 3, 2004, are far outside the safe harbor.

Of course, post-arrest statements made outside of the six-hour safe harbor period are not automatically inadmissible.  In order to determine whether such statements are inadmissible, the Ninth Circuit has articulated two different tests.  See Van Poyck, 77 F.3d at 288-89 (noting the intra-circuit conflict);  United States v. Alvarez-Sanchez, 975 F.2d 1396, 1404-05 (9th Cir. 1992) (same), rev'd on other grounds, 511 U.S. 350 (1994).  "In one line of cases, [the Ninth Circuit has] looked to the reasonableness of the delay; if it is reasonable, the statement is admissible.  In another line, [the Ninth Circuit has] looked to public policy concerns such as discouraging officers from unnecessarily delaying arraignments, preventing admission of involuntary confessions, and encouraging early processing of defendants; if public policy favors admission, the statement is admissible." Van Poyck, 77 F.3d at 289.

Under either test, the government violated Rule 5.  First, as to reasonableness, there was no reason Mr. Ramirez could not have been promptly taken before a magistrate judge once doctors cleared him "fit" to be released from the hospital where he was recovering from his injuries, considering the proximity of the federal courthouse to where he was detained.  In fact, a magistrate even could have arraigned

Mr. Ramirez in a hospital. And Rule 5(f) even permits that arraignment to be via teleconference. None of these things were done. Instead, Mr. Ramirez's arraignment was delayed for the sole and improper purpose of gathering additional evidence to justify his arrest, c.f. McLaughlin, 500 U.S. at 56, namely his confession.

Accordingly, Mr. Ramirez requests that the Court dismiss the indictment. See United States v. Osunde, 638 F. Supp. 171 (N.D. Cal. 1986) (approving dismissal for violation of Rule 5(a)). Alternatively, he requests that the Court suppress statements.

**XIV.**

**ANY STATEMENTS MADE BY MR. RAMIREZ SHOULD
BE SUPPRESSED BECAUSE THEY WERE NOT TAKEN IN COMPLIANCE
WITH MIRANDA, AND THEY WERE INVOLUNTARY UNDER 18 U.S.C. §3501**

**A.      The Government Must Demonstrate Compliance With *Miranda*.**

### 1.      *Miranda* Warnings Must Precede Custodial Interrogation

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Id.

### 2. The First Interrogation Required *Miranda* Warnings.

An officer's obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is "in custody." Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). Here, Mr. Ramirez was taken into custody when he was apprehended at the scene of the accident. Mr. Ramirez remained in DHS custody while he was hospitalized, and he continued to be in custody when he was transported from the hospital to the border patrol station on October 2, 2007.

Around 12:30 pm on October 2, 2007, border patrol agents began questioning Mr. Ramirez about his immigration status without Miranda warnings. His statements must be suppressed.

### 3.   The Government Must Demonstrate That Mr. Ramirez's Alleged Waiver Was Voluntary, Knowing, and Intelligent

Mr. Ramirez was again interrogated a few hours later.  The government will argue that the second interrogation of Mr. Ramirez were supported by a Miranda waiver.  The government has the burden of proving the Miranda warnings were sufficient.  The government has failed to do so.  When interrogation continues without the presence of an attorney, and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived his privilege against self-incrimination and his right to retained or appointed counsel.  Miranda, 384 U.S. at 475.  It is undisputed that a waiver of the right to remain silent and the right to counsel must be made knowingly, intelligently, and voluntarily in order to be effective.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  The standard of proof for a waiver of this constitutional right is high.  Miranda, 384 U.S. at 475.

Derrick v. Peterson, 924 F.2d 813 (9th Cir. 1990), confirmed that the issue of the validity of a Miranda waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and intelligent.  Id. at 820.  The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the [Fifth] Amendment . . . ."  Id.

The second prong, however, requiring that the waiver be "knowing and intelligent," mandates an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id. at 820-21 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  This inquiry requires that the court determine whether "the requisite level of comprehension" exists before the purported waiver may be upheld.  Id.  Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Id. (citing Colorado v. Spring, 479 U.S. at 573) (emphasis in original) (citations omitted)).  The government must demonstrate that Mr. Ramirez's rights were explained to him in a language he understood.  See, e.g., United States v. Garibay, 143 F.3d 534 (9th Cir. 1998).  The prior questioning of Mr. Ramirez without advising him of his rights leans toward a finding that Mr. Ramirez did not knowingly and voluntarily waive his Miranda rights.  Moreover, Mr. Ramirez was interrogated after suffering acute injuries in this case and a lengthy stay in the hospital. Although Mr. Ramirez told agents

that he was being medicated with several drugs, agents did not investigate what drugs he was using or what their effect was on his ability to comprehend his situation.

**B.      Mr. Ramirez's Statements Were Involuntary.**

Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived of due process of law if his conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964).   The government bears the burden of proving that a confession is voluntary by a preponderance of the evidence.  Lego v. Twomey, 404 U.S. 477, 483 (1972).

However, as a preliminary matter, five factors set out in §3501(b) guide the determination as to whether a statement is voluntary under §3501(a).  In this particular case, "[t]he first factor, delay in arraignment, weighs heavily in favor of suppression as the delay [was 31 days and was unreasonable]. The fifth factor also weighs in favor of suppression because [Mr. Ramirez] was not represented by counsel." Alvarez-Sanchez, 975 F.2d at 1406 n.10 (alternatively suppressing statements based on section 3501(a)).  As to the second factor under §3501(b), "whether [Mr. Ramirez] knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession," there is no indication in the record that he was so advised.  Considering all of the relevant factors, "along with the unreasonableness of the delay in arraignment, [this court] should conclude that suppression of the confession is required."  Alvarez-Sanchez, 975 F.2d at 1046 n.10.

**C.      Both Mr. Ramirez's Pre-Miranda and Post-Miranda Statements at the Border Patrol Station Must Be Suppressed.**

United States v. Williams, 453 F.3d 1148 (9th Cir. 2006), holds that Miranda requires suppression "where law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights."  See Williams, 435 F.3d at 1158 (emphasis in original).  In the instant case, the arresting agent not only interrogated Mr. Ramirez once he arrived at the border patrol station; he again questioned Mr. Ramirez in the border patrol station where he advised Mr. Ramirez of his Miranda rights on video and interrogated him for a second time. This two-step process was deliberate and intentional.

Williams interprets Missouri v. Seibert, 542 U.S. 600 (2004), to require a hybrid intent inquiry, in which both objective and subjective facts are relevant, but in which the objective considerations predominate. See Williams, 435 F.3d at 1158-60 ("courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning") (citing Seibert, 542 U.S. at 616 (Souter, J., plur. op.)) (additional citation omitted). "Such objective evidence would include the timing, setting, and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre and postwarning statements." Id. at 1159 (citing Seibert, 542 U.S. at 616 (Souter, J., plur. op.), 621 (Kennedy, J., concurring)).

The predominance of objective factors in the analysis is made manifest by Williams' recognition that "[o]nce a law enforcement officer has detained a suspect *and subjects [her] to interrogation* -- as was the case in Seibert and is the case here -- there is rarely, if ever, a legitimate reason to delay giving a Miranda warning until the suspect has confessed. Instead, the most plausible reason for the delay is an *illegitimate* one, which is the investigator's desire to weaken the warning's effectiveness." Id. (emphasis in original). Mr. Ramirez's pre and post Miranda statements must be suppressed.

**D.     Mr. Ramirez Requests That This Court Conduct An Evidentiary Hearing for All Statements.**

This Court must make a factual determination as to whether a confession was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

All statement issues in this case require an evidentiary hearing to determine whether any warning were give, whether any warnings were adequate, and whether the statements were voluntary and or fruits of a previous Miranda violation. Under section 3501(b), in making the voluntariness determination, this Court *must* consider "all the circumstances surrounding the giving of the confession"

including various enumerated factors including whether the defendant understood the nature of the charges against him and whether he understood his rights.  Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors. Mr. Ramirez accordingly requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the jury, whether any statements made by the defendant were voluntary.

## XV.

### MOTION TO SUPPRESS IDENTIFICATION TESTIMONY

Here, the government has obtained pretrial identifications by a photo line-up in which Mr. Ramirez was allegedly identified as a foot guide.  The government may seek to introduce an in-court identification through a material witness (and in the case of the video deposition of Ontoniel Mendoza-Arreola, already has) based on an identification made during a previous identification or photo line-up.

The identifications during photo line-up were impermissibly suggestive and not conducted with necessary procedural safeguards, such as cautionary instructions, obtaining a description beforehand of the individual, obtaining information regarding the opportunity to observe the individual, and the like. Any in-court identification, if one will occur, is tainted by the impermissibly conducted out-of-court line-up.  It is well-established that the failure to give cautionary instructions and failure to observe other procedural safeguards regarding eyewitnesses prior to showing photos is considered bad police practice and runs a dangerous risk of misidentification. *See* Cutler & Penrod, *Mistaken Identification* (1995) pp. 115-120.

Identification testimony obtained by unduly suggestive procedures violates a defendant's right to due process because it may lead to an irreparably mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-01 (1967); *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991).  A suggestive pre-trial identification may so taint subsequent out-of-court and in-court identifications that an accused is denied due process of law if the witness is permitted to make the in-court identification. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).  Once a procedure is established as impermissibly suggestive, the reliability of the subsequent in-court identification of evidence must be analyzed by weighing the indicia of reliability against the indicia of improper influence, that is "the corrupting tendencies of a suggestive pre-trial identification procedure." *United States v.*

*Field*, 625 F.2d 862, 867 (9th Cir. 1980).  This Circuit has held that "[c]onvictions based on in-court identifications following a pre-trial identification by photograph will be set aside where the photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification."  *United States v. Barrett*, 703 F.2d 1076, 1084 (9th Cir. 1983).

If the line-up was unduly suggestive, there is a presumption against the admissibility of the in-court identification unless demonstrated to be reliable under the totality of the circumstances. *Manson v. Braithwaite*, 432 U.S. 98 (1977); *Neal v. Biggers*, 409 U.S. 188, 199 (1972); *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984).

The following factors must be considered in assessing the reliability of the identification testimony: the witness's opportunity to view the perpetrator, the witness' degree of attention, the witness' level of certainty, the time between the crime and the confrontation, and the accuracy of the prior description. *Neal* 409 U.S. at 199;  *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991); *United States v. Flannigan*, 884 F.2d 945, 949 (7th Cir. 1989).

Mr. Ramirez requests an evidentiary hearing.

## XVI.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Mr. Ramirez requests leave to file further motions as may be necessary.

## XVII.

## CONCLUSION

For the foregoing reasons, Mr. Ramirez respectfully requests that the Court grant the above

motions.

Respectfully submitted,


Dated:  May 2, 2008                              */s/ Ellis M. Johnston*
                                                **ELLIS M. JOHNSTON**
                                                Federal Defenders of San Diego, Inc.
                                                Attorneys for Mr. Ramirez-Ayala