KAREN P. HEWITT
United States Attorney
LAWRENCE A. CASPER
Assistant U.S. Attorney
California State Bar No. 235110
Federal Office Building
880 Front Street, Room 6293
San Diego, California  92101-8893
Telephone No.: (619) 557-7455
Facsimile No.:  (619) 557-7055
Lawrence.Casper@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>v.<br><br><br>ALFREDO ENRIQUE RAMIREZ-AYALA (3),<br><br>Defendant. | Criminal Case No.  07CR2531-W<br><br>District Judge:  Hon. Thomas J. Whelan<br>Courtroom:  9 (Second Floor)<br>Date:  June 16, 2008<br>Time:  2:00 p.m.<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO:<br><br>(1) PRESERVE EVIDENCE;<br>(2) COMPEL DISCOVERY;<br>(3) DISMISS COUNTS 1,3,6,9,12 AND 15;<br>(4) DISMISS INDICTMENT (APPRENDI);<br>(5) DISMISS ALL COUNTS (MENS REA);<br>(6) DISMISS "RESULTING IN DEATH" CHARGE AS UNCONSTITUTIONAL;<br>(7) DISMISS AIDING & ABETTING COUNTS;<br>(8) DISMISS INDICTMENT BECAUSE SOME SMUGGLED ALIENS WERE DEPORTED;<br>(9) DISMISS INDICTMENT (GRAND JURY MISINSTRUCTION);<br>(10) BIFURCATE THE TRIAL;<br>(11) SUPPRESS STATEMENTS (GERSTEIN);<br>(12) SUPPRESS STATEMENTS FOR PRE-ARRAIGNMENT DELAY;<br>(13) SUPPRESS STATEMENTS (MIRANDA);<br>(14) SUPPRESS ID TESTIMONY; and<br>(15) FILE FURTHER MOTIONS<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES, AND GOVERNMENT'S MOTION TO COMPEL PRODUCTION OF RECIPROCAL DISCOVERY. |

# I

## INTRODUCTION

Plaintiff, the UNITED STATES OF AMERICA, by and through its counsel KAREN P. HEWITT, United States Attorney, and LAWRENCE A. CASPER, Assistant U.S. Attorney, hereby files its Response in Opposition to the above-described motions filed by Defendant Alfredo Enrique Ramirez-Ayala ("Defendant") and hereby files its Motion To Compel Production of Reciprocal Discovery. This Response in Opposition and Motion is based upon the files and records of this case.

# II

## STATEMENT OF FACTS

### A.    Statement of the Case

#### 1.    The Crash Scene

On September 1, 2007, at approximately 2:45 p.m., Supervisory Border Patrol Agent (SBPA) Kyle Krall of the El Cajon Border Patrol Station was performing line watch duties in his marked patrol vehicle. SBPA Krall spotted a vehicle traveling west on State Road 94 near Potrero, California that appeared heavily laden; accordingly, he believed the vehicle might be loaded with undocumented aliens. The vehicle was a Ford Explorer bearing California license plates (6AID437). SBPA Krall was traveling east and turned his vehicle around and headed west to get a better look at the vehicle. SBPA Krall did not activate his lights or siren.

At approximately 2:50 p.m., SBPA Krall came upon a one vehicle rollover traffic accident at 24052 State Road 94 near Tecate, California. SBPA Krall found a burgundy Ford Explorer overturned on the side of the road; that vehicle appeared to be the same one SBPA Krall had previously observed. SBPA Krall could see that there were multiple injuries and requested that emergency medical services and the California Highway Patrol (CHP) respond. At approximately 2:55 p.m. emergency medical services responded. At approximately 3:30 p.m., CHP arrived on scene.

The accident resulted in two fatalities and multiple injuries. A total of ten individuals were transported to local hospitals. At approximately 1:35 a.m. on September 2, 2007, seven of the ten individuals returned to the El Cajon Border Patrol Station after been medically cleared for travel and

1    incarceration.  Those seven included the four material witnesses in this case, Jose Maria Hueso

2    Luna; Carlos Sambrano-Perez; Gilberto Ortega-Paredes; and Otoniel Mendoza-Arreola, along with

3    three individuals who were subsequently voluntarily returned to Mexico.  Each of these individuals

4    was determined to be a Mexican citizen with no legal right to enter or remain in the United States.

5    They were subsequently transported to the Chula Vista Border Patrol Station for further processing.

6           In total, there were twelve individuals in the Explorer when the accident occurred:

7    Defendant Ayala-Ramirez ("Defendant") (one of the foot guides), eight  illegal aliens being

8    smuggled into the United States (one deceased), the driver (deceased); the front seat passenger

9    (defendant Adan Padilla-Vasquez); and a second foot guide (determined to be a juvenile).

10          Defendant sustained a head injury that left him hospitalized from the date of the accident

11   when he was reported to be in critical condition until October 2, 2007 when he was released to the

12   custody of the Border Patrol.  At approximately 12:30 p.m. on that date, Defendant arrived from

13   Scripps Mercy Hospital to the Chula Vista Border Patrol Station for processing.  Prior to his release,

14   Defendant was deemed fit for travel and incarceration by doctors.

15          The two individuals who died as a result of the rollover crash were identified as Fernando

16   Garcia-San Juan and Joel Delgado-Parro.  Fernando Garcia San-Juan was identified as one of the

17   aliens who was being smuggled into the United States.  Joel Delgado-Parra was determined to be

18   the driver of the vehicle.

19                              **2.    Defendant's Statements**

20          Upon arriving at the Chula Vista Border Patrol Station, Defendant was questioned by Border

21   Patrol Agent Andrew Kahl as to his immigration status.  Defendant stated that he was a Mexican

22   citizen without proper documentation allowing him to enter or remain in the United States legally.

23   Defendant was determined to have an immigration record but no prior criminal convictions.  At

24   approximately 2:30 p.m., Defendant was given his consular communication rights by Agent Kahl

25   and witnessed by Border Patrol Agent Luis Rivera.  Defendant declined to exercise this right.

26          At approximately 2:36 p.m. – less than three hours after his arrival at the Border Patrol

27   Station from the Scripps Mercy Hospital – Defendant was read his Miranda rights by Agent Kahl

28

1    and witnessed by Agent Rivera, which he acknowledged he understood and waived. Defendant then

2    provided a voluntary statement.

3    Defendant stated that he had taken medication, including tylenol, earlier that morning but

4    felt fine to answer questions. Defendant admitted that his true name was Alfredo Enrique Ramirez-

5    Ayala. He initially denied that he was an alien smuggler and claimed he was crossing into the

6    United States to obtain work and stated that he was not a foot guide. Upon being confronted with

7    the fact that he had been identified as a foot guide by many of the smuggled aliens, he admitted that

8    he was, in fact, a foot guide and that he had worked as a guide on four occasions. Defendant stated

9    that he had been approached by his cousin, an alien smuggler known as "El Chilango" and offered

10   work as a guide smuggling aliens into the United States. Defendant stated that his cousin has a

11   history of smuggling aliens but that he no longer crosses himself.

12   Defendant claimed he began smuggling aliens one month earlier and that, during that period,

13   he had successfully crossed two groups – a total of 15 aliens. On the third attempt, Defendant stated

14   that he was arrested and this was his fourth time. Defendant claimed that the organization he works

15   for crosses aliens in an area known as "San Jose." He stated that there is a dirt road through which

16   they enter; that they drop off two spotters first and then continue down the road where the guides

17   and aliens are dropped off. The spotters then tell them when it is clear to go and they cross

18   underneath the border fence through a drainage tube. They usually sent two foot guides in each

19   group and that he and the other foot guides were paid $100 for each alien successfully smuggled.

20   Defendant stated that "El Chilango" called him the day before the accident and offered him

21   work and he agreed. Defendant met up with the smuggled aliens at approximately 6:00 a.m. on

22   September 1, 2007 near where they were to cross the border. Defendant said that a Jeep Cherokee

23   picked them up south of the border fence and brought them closer to the spot where they were to

24   cross. When the spotters told them it was clear, they went. Defendant said that the other foot guide

25   who was in the lead, was carrying the radio and was in communication with the spotters. Defendant

26   was behind the group and said he was tasked with brushing out the group's footprints at the north

27   end of the drainage tube. Upon reaching the highway, it was again his job to wipe away any

28   footprints on the side of the highway.

1

### 3.    The Material Witnesses' Statements

2

#### a.    <u>Material Witness Otoniel Mendoza-Arreola's Statement</u>

3       On September 3, 2007, after being returned to the Chula Vista Border Patrol Station

4  following treatment at the hospital, Border Patrol Agent Andrew Kahl interviewed material witness

5  Otoniel Mendoza-Arreola.  During that interview, Mendoza was shown photographs of all of the

6  individuals involved in the September 1, 2007 rollover accident.  He was asked to examine the

7  photographs and to separate the photographs into 2 groups – those that crossed the border on foot

8  with him and those that did not. Mendoza was not told who was injured during the crash or what

9  injuries were sustained by Defendant or any of the other individuals.  The photographs that were

10  used were Polaroid shots of each of the surviving individuals taken following the accident.  Because

11  certain of the survivors were severely injured and hospitalized with neck braces and tubes and the

12  photographs taken in the hospital were not of the highest quality, the agents included in the Polaroid

13  pack different angles to allow Mendoza a fair opportunity to identify those individuals.  For the two

14  deceased individuals, because post-accident Polaroid photographs would not have been useful and

15  following the identifications of those two individuals, the agents were able to secure photographs

16  from their prior immigration apprehensions and included those photographs.  Mendoza subsequently

17  identified Defendant as one of the two foot guides who led them through the hills from Mexico into

18  the United States on September 1, 2007 and told agents that Defendant was the person following

19  behind the group of aliens.  At this point, the agents were still confirming the identities of all of the

20  individuals involved in the rollover.

21       On September 4, 2007, at approximately 12:58 p.m., Border Patrol Agent Kahl conducted

22  a videotaped interview of this material witness.  Mendoza stated that he was a citizen and national

23  of Mexico who resides in Hermosillo, Sonora, Mexico and admitted that he presently has no legal

24  right to enter or remain in the United States.

25       Mendoza explained that he arrived from Sonora to Tijuana by bus approximately one week

26  before crossing the border on September 1, 2007.  He made smuggling arrangements with an

27  unknown smuggler in exchange for a smuggling fee of $3,000 (U.S. dollars).  Mendoza admitted

28  his final destination was Ontario, California.

Once the arrangements were made, he was taken to a load house and then, on the morning of September 1, 2007, to a shopping plaza in Tijuana where he was grouped with other undocumented aliens involved in this smuggling effort. Subsequently, they met their foot guides, including the Defendant, who provided them with instructions and traveled with them in a Jeep Cherokee to an area near the border fence in the Tecate area where they were going to illegally cross into the United States.

After the group was dropped off, the lead foot guide, who Mendoza later identified as Defendant, led them to an area hidden by big trees where they were instructed to hide. After approximately two hours, Mendoza said that one of the foot guides who had a Nextel radio received a call telling them it was clear to go. Defendant said that the two foot guides ordered them to start walking. They walked until reaching the border fence, crossed the border, and were lead by their guides to a paved road. The guides instructed the group when to walk when to hide and when to lie down in the high brush. Upon reaching the road, the guides directed them to hide in trees off to the side of the road. They waited several hours before a red Ford Explorer sped passed them, completed an illegal U-turn in the middle of the road, and came to a complete stop near the group.

The foot guides yelled for everyone to get into the vehicle quickly. As they got in, the driver began yelling obscenities at them and shouted at them to hurry because they were making him nervous by how long they were taking. Mendoza believed that everyone, including the two guides, got into the vehicle. Once everyone was in, the driver of the vehicle accelerated and sped off. Thereafter, the driver yelled that the Border Patrol had spotted them but the driver continued to accelerate to an uncontrollable speed. Two males and two females shouted for the driver to stop. The driver ignored these pleas and lost control of the vehicle. In turn, the vehicle went off the road and began to roll; Mendoza believed that it flipped four times before stopping. Two or three people were ejected from the vehicle.

Mendoza stated that he suffered bumps and bruises on his lower back, top of his head and his left chin. Mendoza identified – through the same photo array of the individuals in the accident – Defendant as the elder of the two foot guides who led them through the hills from Mexico into the United States. Mendoza noted that the Defendant was behind the group. Mendoza identified a photo

07CR2531-W

1    of one of the decedents (Joel Delgado-Parra) as the driver of the vehicle.  Mendoza also identified the

2    other foot guide and stated that he did not recognize one individual (Defendant Adan Padilla-Vasquez)

3    in the photographs but stated that individual did not cross into the United States on foot with the group.

4    Mendoza also identified the photograph of one of the decedents as the nephew of one of the other

5    undocumented aliens who traveled with them.

6                           b.    Material Witness Gilberto Ortega-Paredes' Statement

7         On September 3, 2007, after being returned to the Chula Vista Border Patrol Station following

8    treatment at the hospital, Border Patrol Agent Andrew Kahl interviewed material witness Gilberto

9    Ortega-Paredes.  Ortega, too, was shown photographs of all of the individuals involved in the

10    September 1, 2007 rollover accident.  He was also asked to examine the photographs and to separate

11    the photographs into 2 groups – those that crossed the border on foot with him and those that did not.

12    Ortega was not told who was injured during the crash or what injuries were sustained by Defendant or

13    any of the other individuals.  The same photographs that were used with Mendoza were used with

14    Ortega.  Ortega  subsequently also identified Defendant as the elder of the two foot guides who led

15    them through the hills from Mexico into the United States on September 1, 2007.

16         On September 4, 2007, at approximately 2:09 p.m.,  Agent Kahl conducted an interview of this

17    material witness.  Ortega stated that he was from Aguascalientes, Mexico and that both of his parents

18    are Mexican citizens.  He admitted crossing the border illegally near Tecate, California and admitted

19    that he has no legal right to enter or remain in the United States.

20         Ortega arrived at the Tijuana airport on August 25, 2007, stayed with a family friend in Tijuana

21    and he made smuggling arrangements through the family friend.  He told the agents he was to pay a

22    smuggling fee of $2,500 to $2,800 to be smuggled to Los Angeles, California.  On September 1, 2007,

23    he was picked up and taken to or near a gas station from which he and other individuals were taken to

24    Tecate, Baja California, Mexico.  Subsequently, the foot guides, including Defendant, arrived.  Three

25    foot guides were then present but only two of them, including Defendant Ayala-Ramirez, actually

26    crossed with the group into the United States. .

27         After crossing into the United States, the group crossed a road and waited there until the vehicle

28    arrived.  Ortega saw the vehicle pass their location and turn around.  At that time, he noticed that there

1    were already two individuals in the vehicle – a driver and front seat passenger.  The group got in as

2    instructed.  The driver yelled and cursed at them .  Ortega was behind the driver's seat.  Ortega

3    observed that the driver was wearing a light greenish plaid shirt and the passenger was wearing a white

4    shirt.

5         Ortega felt the driver lose control of the vehicle and the vehicle flipped approximately four

6    times.  His right arm was trapped but he managed to free it.  A Border Patrol Agent assisted him from

7    the vehicle.  He saw a deceased individual whom he believed to be the driver.  Next to the deceased

8    driver was an individual in a white shirt who did not cross on foot with the group who was crying and

9    saying "primo" (cousin).  Ortega believes that individual was the front seat passenger, who was already

10   in the vehicle when it arrived.

11        Ortega identified the second decedent (Fernando Garcia-San Juan) – through the photo array

12   of the accident victims – as the nephew of one of the females in the group.  Ortega also identified the

13   front seat passenger, whom he stated did not cross on foot with the group.  He also identified Defendant

14   Ayala-Ramirez as one of the foot guides..

15                    c.    Material Witness Jose Maria Hueso-Luna's Statement

16        On September 3, 2007, after being returned to the Chula Vista Border Patrol Station following

17   treatment at the hospital, Border Patrol Agent Edward Ortega interviewed material witness Jose Maria

18   Hueso-Luna.  During that interview, Hueso was shown photographs of all of the individuals involved

19   in the September 1, 2007 rollover accident.  He was asked to examine the photographs and to separate

20   the photographs into 2 groups – those that crossed the border on foot with him and those that did not.

21   Mendoza was not told who was injured during the crash or what injuries were sustained by Defendant

22   or any of the other individuals.  The photographs that were used were the same Polaroid shots shown

23   to the other material witnesses.  Hueso also subsequently identified Defendant as the elder of the two

24   foot guides who led him and the others in the group through the hills from Mexico into the United

25   States.

26        On September 4, 2007, at approximately 3:16 p.m., Agent Kahl conducted a videotaped

27   interview of this material witness.  Hueso stated that he was born in Armeria, Cofederia, Colima,

28

Mexico and presently has no legal status in the United States. He admitted that he entered the United States illegally on September 1, 2007.

On August 22, 2007, Hueso arrived in Tijuana with his wife. His final destination was to have been Los Angeles, California and he admitted that he and his wife were each to pay a smuggling fee of $2,200 to be smuggled into the United States. On September 1, 2007 he was told to go to a shopping center in Tijuana to meet a smuggler. Once there, he got into a Cherokee and was driven from Tijuana to the Tecate area. The driver dropped him along with others there; they were told to wait for the rest of the group which subsequently arrived. When the Cherokee returned, the smuggled aliens piled in and they drove on a dirt road for approximately twenty minutes before stopping.

Hueso stated that there were two foot guides. He indicated that the first guide wore a navy blue shirt and had spiky hair that was tapered; he was about 19 or 20 years old and had a dark complexion with bulging cheekbones and a large nose. He was medium height and medium build and had a direct connect type cell phone. The other foot guide was of lighter complexion, skinnier and about 22 or 23 years old. He had a longish face with the sides of his head shaved and a little bit of hair on top. He was taller than the first guide and had a conventional cell phone with no radio.

After waiting in hiding for two hours near the border, the group crossed through a drainage pipe under the border fence. After a short period, Hueso's wife could not keep up and Hueso and the older foot guide, Defendant Ramirez-Ayala, took her back while the group continued. Hueso and the foot guide subsequently crossed again and met up with the group while they were waiting for the vehicle near the highway.

Hueso said that the younger foot guide told them that a red SUV was coming to pick them up. That guide said that it would not have seats and that they were to lie down on the floor and pile in the back. The red SUV arrived; they climbed in and lied down as instructed.

After a few minutes, Hueso could hear the tires squealing and thought that they were going to flip over. The driver said that the Border Patrol was behind them. Passing trucks were honking their air horns at the Ford Explorer. The driver was yelling obscenities. According to Hueso, even the foot guides were yelling at the driver to stop.

1    Hueso felt the SUV flip over and then flip over again. Hueso was thrown clear of the vehicle
2    and tumbled along the ground until he was able to stop himself. After the accident, Hueso went into
3    someone's driveway and hid beside a pond; another smuggled alien approached him and told him he
4    was bleeding from the head. Hueso used his shirt to clean the wound with the pond water. He hid
5    behind some rocks and was holding the shirt against the cut on his head when he lost consciousness.
6    Subsequently, he was escorted by a local resident back to the highway.

7    Hueso was shown the array of Polaroid photographs of all of the survivors of the crash. He
8    identified Defendant Ramirez-Ayala as the taller foot guide who had taken him and his wife back to
9    the border fence and then led him back to the rest of the group. He also identified the shorter foot guide
10   who was in front of the group leading them. He stated that the shorter guide told them that a red SUV
11   was coming and that they were to lie on the floor in the back of the vehicle. Regarding the photo of
12   Adan Padilla-Vasquez, Hueso said that he did not recognize Padilla and that Padilla had not crossed
13   with the group on foot.

14                      d.    Material Witness Carlos Sambrano-Perez's Statement

15   On September 3, 2007, after being returned to the Chula Vista Border Patrol Station following
16   treatment at the hospital, Border Patrol Agent Edward Ortega interviewed material witness Carlos
17   Sambrano-Perez. During that interview, Sambrano, too, was shown the same set of photographs of all
18   of the individuals involved in the September 1, 2007 rollover accident. As with the other material
19   witnesses, he was asked to examine the photographs and to separate the photographs into 2 groups –
20   those that crossed the border on foot with him and those that did not. Sambrano was not told who was
21   injured during the crash or what injuries were sustained by Defendant or any of the other individuals.
22   Sambrano subsequently identified Defendant as one of the two foot guides who led them through the
23   hills from Mexico into the United States on September 1, 2007.

24   On September 4, 2007, at approximately 6:01 p.m., Border Patrol Agent Andrew Kahl
25   conducted an interview of this material witnessz. Sambrano admitted to being a Mexican citizen with
26   no legal right to enter or remain in the United States. He admitted to crossing illegally near Tecate on
27   September 1, 2007. He also admitted that he made his smuggling arrangements in Tijuana and that he
28   was being charged $2,200 to be smuggled to Utah. His family was to pay the fee.

Two young individuals guided them across the border; a third foot guide did not cross with them. The foot guide leading the group was in constant communication via cell phone with someone. Sambrano and nine others waited approximately two hours before getting into the red SUV that was being driven by a male individual and had a male passenger. The driver was driving at an excessive speed and Sambrano feared for his life. He overheard someone yelling at the driver to stop; that person said we have time to stop and run because the Border Patrol is not behind us. Sambrano said the driver was yelling back at them to get down and shut up.

Sambrano heard the tires screeching and felt the vehicle sway and then roll over. He pulled an individual out of the vehicle who had a broken arm. That person said to him in Spanish "Don't finger me, cousin." This was an individual who did not cross with the group on foot. Sambrano identified Defendant – using the photo array – as one of the two footguides who led the group.

.                                   **III**

**ARGUMENT**

**A.      The United States Has No Objection To an Appropriate Preservation Order**

The United States does not oppose a properly limited preservation order but notes that it did not find a proposed preservation order attached to the Defendant's voluminous motions nor was such a proposed order received electronically by the undersigned Assistant United States Attorney. After issuance of a an order from the Court, the United States will preserve all evidence to which Defendant is entitled to pursuant to the relevant discovery rules. The United States does, however, object to Defendant's blanket request to preserve all physical evidence.

The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within his possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or are intended for use by the United States as evidence in chief at trial, or was obtained from or belongs to Defendant, including photographs. The United States has made the evidence available to Defendant and Defendant's investigators and will continue to comply with any reasonable request for inspection.

07CR2531-W

1

**B.    The Government Will Comply With All Discovery Obligations**

2       The Government intends to continue full compliance with its discovery obligations under Brady

3   v. Maryland, 373 U.S. 83 (1963), the Jencks Act (18 U.S.C. 3500), and Rule 16 of the Federal Rules

4   of Criminal Procedure.[1]/ To date, the Government has provided 488 pages of discovery as well as

5   DVDs that include the advisals of rights and post-arrest statements of Defendant and Adan Padilla-

6   Vasquez;  DVDs containing the videotaped statements of each of the four material witnesses; the

7   dispatch tape in CD format; a VHS tape of the location of the accident; and multiple DVDs containing

8   photographs of the accident scene.  The United States has fully complied with its discovery obligations.

9   To date, Defendant has provided no reciprocal discovery.   The Government anticipates that all

10  discovery issues can be resolved amicably and informally, and has addressed Defendant's specific

11  requests below.

12          **(1)  Defendant's Statements**

13      The Government recognizes its obligation under Rules 16(a)(1)(A) and 16(a)(1)(B) to provide

14  to Defendant the substance of Defendant's oral statements and Defendant's written statements.  The

15  Government has produced all of the Defendant's statements that are known to the undersigned

16  Assistant U.S. Attorney at this date.  If the Government discovers additional oral or written statements

17  that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be provided

18  to Defendant.

19      The Government has no objection to the preservation of the handwritten notes taken by any of

20  the agents and officers.  See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must

21  preserve their original notes of interviews of an accused or prospective government witnesses).

22  However, the Government objects to providing Defendant with a copy of the rough notes at this time.

23  Rule 16(a)(1)(A) does not require disclosure of the rough notes where the content of those notes have

24  been accurately reflected in a type-written report.  See United States v. Brown, 303 F.3d 582, 590 (5th

25  Cir. 2002); United States v. Coe, 220 F.3d 573, 583 (7th Cir. 2000) (Rule 16(a)(1)(A) does not require

26  disclosure of an agent's notes even where there are "minor discrepancies" between the notes and a

27

28      [1]   Unless otherwise noted, all references to "Rules" refers to the Federal Rules of
        Criminal Procedure.

1  report).  The Government is not required to produce rough notes pursuant to the Jencks Act, because

2  the notes do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise

3  both a substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted

4  by the witness.  United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980).  The rough notes in

5  this case do not constitute "statements" in accordance with the Jencks Act.  See United States v.

6  Ramirez, 954 F.2d 1035, 1038-39 (5th Cir. 1992) (rough notes were not statements under the Jencks

7  Act where notes were scattered and all the information contained in the notes was available in other

8  forms).  The notes are not Brady material because the notes do not present any material exculpatory

9  information, or any evidence favorable to Defendant that is material to guilt or punishment.  Brown,

10  303 F.3d at 595-96 (rough notes were not Brady material because the notes were neither favorable to

11  the defense nor material to defendant's guilt or punishment); United States v. Ramos, 27 F.3d 65, 71

12  (3d Cir. 1994) (mere speculation that agents' rough notes contained Brady evidence was insufficient).

13  If, during a future evidentiary hearing, certain rough notes become discoverable under Rule 16, the

14  Jencks Act, or Brady, the notes in question will be provided to Defendant.

15  **(2)**     **Arrest reports, notes, memos**

16  The Government has provided Defendant with all known reports related to Defendant's arrest

17  in this case that are available at this time.  The Government will continue to comply with its obligation

18  to provide to Defendant all reports subject to Rule 16.  As previously noted, the Government has no

19  objection to the preservation of the agents' handwritten notes, but objects to providing Defendant with

20  a copy of the rough notes at this time because the notes are not subject to disclosure under Rule 16, the

21  Jencks Act, or Brady.  The relevant dispatch tape has already been discovered.

22  **(3)**     **Brady Material**

23  The Government has and will continue to perform its duty under Brady to disclose material

24  exculpatory information or evidence favorable to Defendant  when such evidence is material to guilt

25  or punishment.   The Government recognizes that its obligation under Brady covers not only

26  exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on behalf

27  of the United States.  See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bagley,

28  473 U.S. 667, 676-77 (1985).  This obligation also extends to evidence that was not requested by the

1  defense.  Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 107-10 (1976).  "Evidence is

2  material, and must be disclosed (pursuant to Brady), 'if there is a reasonable probability that, had the

3  evidence been disclosed to the defense, the result of the proceeding would have been different.'"

4  Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (en banc).  The final determination of materiality

5  is based on the "suppressed evidence considered collectively, not item by item." Kyles v. Whitley, 514

6  U.S. 419, 436-37 (1995).

7      Brady does not, however, mandate that the Government open all of its files for discovery.  See

8  United States v. Henke, 222 F.3d 633, 642-44 (9th Cir. 2000)(per curiam).  Under Brady, the

9  Government is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence (see

10  United States v. Smith, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the defendant from

11  other sources (see United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995)); (3) evidence that

12  the defendant already possesses (see United States v. Mikaelian, 168 F.3d 380, 389-90 (9th Cir. 1999),

13  amended by 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the undersigned Assistant U.S.

14  Attorney could not reasonably be imputed to have knowledge or control over.  (see United States v.

15  Hanson, 262 F.3d 1217, 1234-35 (11th Cir. 2001)).  Nor does Brady require the Government "to create

16  exculpatory evidence that does not exist," United States v. Sukumolahan, 610 F.2d 685, 687 (9th Cir.

17  1980), but only requires that the Government "supply a defendant with exculpatory information of

18  which it is aware."  United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976).

19          **(4)    Sentencing Information**

20      The United States is not obligated under Brady v. Maryland, 373 U.S. 83 (1963), and its

21  progeny to furnish a defendant with information which he already knows.  United States v. Taylor, 802

22  F.2d 1108, 1118 n.5 (9th Cir. 1986).  Brady is a rule of disclosure, and therefore, there can be no

23  violation of Brady if the evidence is already known to the defendant.  In such case, the United States

24  has not suppressed the evidence and consequently has no Brady obligation.  See United States v. Gaggi,

25  811 F.2d 47, 59 (2d Cir. 1987).

26      But even assuming Defendant does not already possess the information about factors which

27  might affect his guideline range, the United States would not be required to provide information

28  bearing on Defendant's mitigation of punishment until after Defendant's conviction or plea of guilty

1   and prior to his sentencing date.  See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988)

2   ("No [Brady] violation occurs if the evidence is disclosed to the defendant at a time when the disclosure

3   remains in value.").  Accordingly, Defendant's demand for this information is premature.

4                          **(5)    Defendant's Prior Record**

5          The United States has already provided Defendant with a copy of any criminal record in

6   accordance with Federal Rule of Criminal Procedure 16(a)(1)(D).

7                     **(6)    Proposed 404(b) and 609 Evidence**

8          Should the United States seek to introduce any similar act evidence pursuant to Federal Rules

9   of Evidence 404(b) or 609(b), the United States will provide Defendant with notice of its proposed use

10  of such evidence and information about such bad act at or before the time the United States' trial

11  memorandum is filed.  The United States reserves the right to introduce as prior act evidence any

12  conviction, arrest or prior act that is disclosed to the defense in discovery.

13                            **(7)    Evidence Seized**

14         The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing

15  Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence

16  which is within the possession, custody or control of the United States, and which is material to the

17  preparation of Defendant's defense or are intended for use by the United States as evidence in chief at

18  trial, or were obtained from or belong to Defendant, including photographs.

19         The United States, however, need not produce rebuttal evidence in advance of trial.  United

20  States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984), cert. denied, 474 U.S. 953 (1985).

21                           **(8)    Henthorn Material**

22         The Government will comply with United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and

23  request that all federal agencies involved in the criminal investigation and prosecution review the

24  personnel files of the federal law enforcement inspectors, officers, and special agents whom the

25  Government intends to call at trial and disclose information favorable to the defense that meets the

26  appropriate standard of materiality.  United States v. Booth, 309 F.3d 566, 574 (9th Cir. 2002)(citing

27  United States v. Jennings, 960 F.2d 1488, 1489 (9th Cir. 1992).   If the undersigned Assistant U.S.

28

                                        15                              07CR2531-W

1    Attorney is uncertain whether certain incriminating information in the personnel files is "material," the

2    information will be submitted to the Court for an <u>in camera</u> inspection and review.

3                    **(9)    Tangible Objects**

4            The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing

5    Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all tangible objects

6    seized that are within its possession, custody, or control, and that are either material to the preparation

7    of Defendant's defense, or are intended for use by the Government as evidence during its case-in-chief

8    at trial, or were obtained from or belong to Defendant.   The Government need not, however, produce

9    rebuttal evidence in advance of trial.   <u>United States v. Givens</u>, 767 F.2d 574, 584 (9th Cir. 1984).

10                    **(10)    Expert Witnesses**

11           The Government will comply with Rule 16(a)(1)(G) and provide Defendant with a written

12   summary of any expert testimony that the Government intends to use under Rules 702, 703, or 705 of

13   the Federal Rules of Evidence during its case-in-chief at trial.  This summary shall include the expert

14   witnesses' qualifications, the expert witnesses opinions, the bases, and reasons for those opinions.

15                    **(11)    Impeachment Evidence**

16           The Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide evidence that

17   could be used to impeach Government witnesses including material information regarding

18   demonstrable bias or motive to lie.

19                    **(12)    Evidence of Criminal Investigation of Any Government Witness**

20           Defendants are not entitled to any evidence that a prospective witness is under criminal

21   investigation by federal, state, or local authorities.   "[T]he criminal records of such [Government]

22   witnesses are not discoverable." <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976); <u>United</u>

23   <u>States v. Riley</u>, 657 F.2d 1377, 1389 (8th Cir. 1981) (holding that since criminal records of prosecution

24   witnesses are not discoverable under Rule 16, rap sheets are not either); <u>cf.</u> <u>United States v. Rinn</u>, 586

25   F.2d 113, 118-19 (9th Cir. 1978) (noting in dicta that "[i]t has been said that the Government has no

26   discovery obligation under Fed. R. Crim. P. 16(a)(1)(C) to supply a defendant with the criminal records

27   of the Government's intended witnesses.") (citing <u>Taylor</u>, 542 F.2d at 1026).

28

                                16

1    The Government will, however, provide the conviction record, if any, which could be used to

2    impeach witnesses the Government intends to call in its case-in-chief.  When disclosing such

3    information, disclosure need only extend to witnesses the United States intends to call in its case-in-

4    chief.  United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d

5    1305, 1309 (9th Cir. 1979).

6                    **(13)    Evidence of Bias or Motive To Lie**

7    The United States is unaware of any evidence indicating that a prospective witness is biased

8    or prejudiced against Defendant.  The United States is also unaware of any evidence that prospective

9    witnesses have a motive to falsify or distort testimony.

10                    **(14)    Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling**

11    The United States is unaware of any evidence indicating that a prospective witness has a

12    problem with perception, recollection, communication, or truth-telling.  The United States recognizes

13    its obligation under Brady and Giglio to provide material evidence that could be used to impeach

14    Government witnesses including material information related to perception, recollection or ability to

15    communicate.  The Government objects to providing any evidence that a witness has ever used

16    narcotics or other controlled substances, or has ever been an alcoholic because such information is not

17    discoverable under Rule 16, Brady, Giglio, Henthorn, or any other Constitutional or statutory

18    disclosure provision.

19                    **(15)    Witness Addresses**

20    The Government has already provided Defendant with the reports containing the names of the

21    agents involved in the apprehension and interviews of Defendant.  A defendant in a non-capital case,

22    however, has no right to discover the identity of prospective Government witnesses prior to trial.  See

23    Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Dishner, 974 F.2d 1502, 1522 (9th

24    Cir 1992) (citing United States v. Steel, 759 F.2d 706, 709 (9th Cir. 1985)); United States v. Hicks, 103

25    F.23d 837, 841 (9th Cir. 1996).  Nevertheless, in its trial memorandum, the Government will provide

26    Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although delivery of

27    such a witness list is not required.  See United States v. Discher, 960 F.2d 870 (9th Cir. 1992); United

28    States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).

1    The Government objects to any request that the Government provide a list of every witness to

2    the crimes charged who will not be called as a Government witness.  "There is no statutory basis for

3    granting such broad requests," and a request for the names and addresses of witnesses who will not be

4    called at trial "far exceed[s] the parameters of Rule 16(a)(1)(C)."  United States v. Hsin-Yung, 97 F.

5    Supp.2d 24, 36 (D. D.C. 2000) (quoting United States v. Boffa, 513 F. Supp. 444, 502 (D. Del. 1980)).

6    The Government is not required to produce all possible information and evidence regarding any

7    speculative defense claimed by Defendant.  Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995) (per curiam)

8    (holding that inadmissible materials that are not likely to lead to the discovery of admissible

9    exculpatory evidence are not subject to disclosure under Brady).

10                    **(16)    Name of Witness Favorable to the Defendant**

11    As stated earlier, the Government will continue to comply with its obligations under Brady and

12    its progeny.  At the present time, the Government is not aware of any witnesses who have made an

13    arguably favorable statement concerning the defendant.

14                    **(17)    Statements Relevant to the Defense**

15    The United States will comply with all of its discovery obligations.  However, "the prosecution

16    does not have a constitutional duty to disclose every bit of information that might affect the jury's

17    decision; it need only disclose information favorable to the defense that meets the appropriate standard

18    of materiality."  Gardner, 611 F.2d at 774-775 (citation omitted).

19                    **(18)    Jencks Act Material**

20    The Jencks Act, 18 U.S.C. § 3500, requires that, after a Government witness has testified on

21    direct examination, the Government must give the Defendant any "statement" (as defined by the Jencks

22    Act) in the Government's possession that was made by the witness relating to the subject matter to

23    which the witness testified. 18 U.S.C. § 3500(b).  A "statement" under the Jencks Act is (1) a written

24    statement made by the witness and signed or otherwise adopted or approved by him, (2) a substantially

25    verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement

26    by the witness before a grand jury. 18 U.S.C. § 3500(e).  If notes are read back to a witness to see

27    whether or not the government agent correctly understood what the witness was saying, that act

28    constitutes "adoption by the witness" for purposes of the Jencks Act. United States v. Boshell, 952 F.2d

1   1101, 1105 (9th Cir. 1991) (citing <u>Goldberg v. United States</u>, 425 U.S. 94, 98 (1976)).  While the
2   Government is only required to produce all Jencks Act material <u>after</u> the witness testifies, the
3   Government plans to provide most (if not all) Jencks Act material well in advance of trial to avoid any
4   needless delays.

5                   **(19)    Giglio Information**

6        As stated previously, the United States will comply with its obligations pursuant to <u>Brady v.</u>
7   <u>Maryland</u>, 373 U.S. 83 (1963), the Jencks Act, <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991),
8   and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

9                   **(20)    Agreements Between the Government and Witnesses**

10       There are presently no such agreements.

11                  **(21)    Informants and Cooperating Witnesses**

12       If the Government determines that there is a confidential informant who has information that
13  is "relevant and <u>helpful</u> to the defense of an accused, or is <u>essential</u> to a fair determination of a cause,"
14  the Government will either disclose the identity of the informant or submit the informant's identity to
15  the Court for an in-chambers inspection.  See <u>Roviaro v. United States</u>, 353 U.S. 53, 60-61 (1957)
16  (emphasis added); <u>United States v. Ramirez-Rangel</u>, 103 F.3d 1501, 1505 (9th Cir. 1997) (same).

17                  **(22)    Bias By Informants or Cooperating Witnesses**

18       The Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide evidence that
19  could be used to impeach Government witnesses including material information regarding
20  demonstrable bias or motive to lie.

21                  **(23)    Personnel Records of Government Officers Involved in the Arrest**

22       The United States objects to this request.  Defendant has not shown how any personnel records
23  of the arresting officers are relevant to this case.  Defense counsel has no constitutional right to conduct
24  a search of agency files to argue relevance.  See <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59-60 (1987)
25  (citing <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to
26  discovery in a criminal case, and <u>Brady</u> did not create one")).  Thus, the United States will review these
27  records for impeachment information and fully comply with its <u>Henthorn</u> obligations, but will not
28  provide these records as Rule 16 discovery.

**(24)     Training of Relevant Law Enforcement Officers**

Defendant's motion for extensive materials regarding training of law enforcement officers including written, videotaped and other policies, training instructions and manuals to employees should be denied.  Defendant cites no authority that would entitle him to such discovery in general or as applied to the facts of this case.

The United States is not aware of any scientific tests or examinations at this time but, if any scientific tests or examinations were conducted or are conducted in the future, the United States will provide Defendant with any reports of any such tests or examinations in accordance with Rule 16(a)(1)(F).

**(25)     Opportunity to View & Photograph the evidence seized**

The United States has and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense or is intended for use by the United States as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant.

**(26)     Residual Request**

The Government will comply with all of its discovery obligations, but objects to the broad and unspecified nature of Defendant's residual discovery request.

**C.     The Government May Proceed on An Aiding and Abetting Theory**

**1.     The Indictment Does Not Fail to Charge The Proper Mens Rea**

Defendant argues that the Court should dismiss the Indictment or, alternatively, preclude the Government from proceeding under an aiding and abetting theory.  Defendant argues that the Indictment is defective because it fails to charge him with the necessary *mens rea* for aiding and abetting.  These contentions should be rejected.

An indictment need only contain those facts and elements so that the defendant may prepare a defense and invoke the Double Jeopardy clause when appropriate.  See United States v. Gondinez-Rabadan, 289 F.3d 630, 634 (9th Cir. 2002).  An indictment that sets forth the charged offense in the words of the statute itself is generally sufficient.  United States v. Johnson, 804 F.2d 1078, 1084 (9th

1    Cir. 1986 ).  An indictment that puts a defendant on notice of the elements of the offense, even if only

2    by citation to the statutory provision involved, is also sufficient.  United States v. Gelzer, 50 F.3d 1133,

3    1138 (2d Cir. 1995); United States v. Oakie, 12 F.3d 1436, 1440-41 (8th Cir. 1993); United States v.

4    Blackburn, 9 F.3d 353, 357 (5th Cir. 1993).

5         The Indictment in this case tracks the applicable statutory language, provides citations to the

6    applicable statutes at issue, and more than adequately apprises Defendant of the crimes charged.

7    Contrary to Defendant's assertions, count 1 charging Defendant with bringing in an illegal alien for

8    financial gain and aiding and abetting in that crime is not defective.  See United States v.

9    Ramirez-Martinez, 273 F.3d 903, 911 (9th Cir. 2001) (Indictment charging a defendant with violation

10   of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2 was not defective); United States v. Angwin, 271

11   F.3d 786, 800 (9th Cir. 2001) (affirming decision to deny the defendant's motion to dismiss the count

12   charging violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2), cert. denied, 535 U.S. 966

13   (2002); Accord United States v. Lopez, 484 F.3d 1186, 1199-1200 (9th Cir. 2007) (aiding and abetting

14   liability "cannot be rejected as a matter of law"; even one who does not physically transport aliens

15   across the border may be held criminally liable for aiding and abetting a "brings to" offense under

16   certain circumstances).[2/]

17        Defendant's reliance on United States v. Du Bo, 186 F.3d 1177 (9th Cir. 1999) is misplaced.

18   In Du Bo, the defendant's indictment failed to include a mens rea because the indictment only cited to

19   the Hobbs Act.  Id. at 1179.  Here, unlike Du Bo, the Indictment includes the requisite mens rea.  An

20   essential element of aiding and abetting liability is "that the accused had the requisite intent of the

21   underlying substantive offense."  United States v. Sayetsitty, 107 F.3d 1405, 1412 (9th Cir. 1997); see

22   also United States v. Gaskins, 849 F.2d 454, 459 (9th Cir. 1988) (Given that "the intent regarding the

23   underlying substantive offense required to convict a defendant as an aider and abettor is the same intent

24   necessary to convict him as a principal," the intent element was not missing from the original

25   indictment.").

26

27        [2]    In this case, Defendant, a foot guide who led the material witnesses into the United States
     was the initial transporter and he had not yet dropped the aliens off at a location within the United
28   States.  Hence, the crime was not yet complete and aiding and abetting is properly charged.  Lopez,
     483 F.3d at 1199-1200.

                                        21                            07CR2531-W

1    Furthermore, "aiding and abetting is implied in every federal indictment for a substantive

2    offense."  See, e.g., United States v. Armstrong, 909 F.2d 1238, 1241 (9th Cir. 1990).  Aiding and

3    abetting is not a distinct offense from the underlying substantive crime. United States v. Garcia, 400

4    F.3d 816, 820 (9th Cir. 2005) ("Aiding and abetting is simply one means of committing a single

5    crime.").  "Every indictment for a federal offense charges the defendant as a principal and as an aider

6    and abettor; thus a count for aiding and abetting is unnecessary."  United States v. Cannon, 993 F.2d

7    1439, 1442 (9th Cir. 1993).   Accordingly, the Government is free to proceed on an aiding and abetting

8    theory.

9                    **2.        The Indictment Is Not Duplicitous**

10    Defendant argues that the Indictment is fatally duplicitous because it charges both alien

11    smuggling, in violation of 8 U.S.C. § 1324, and aiding and abetting, in violation of 18 U.S.C. § 2.

12    Indictments charging two or more distinct offenses in a single count are duplicitous.  See, e.g.,

13    United States v. Nattier, 127 F.3d 655, 658 (8th Cir. 1997) (count of indictment charging both

14    conspiracy to embezzle funds and to launder proceeds was held duplicitous).  Aiding and abetting,

15    however, is not a distinct offense from the underlying substantive crime.  In fact, this issue was settled

16    by the Ninth Circuit in United States v. Garcia, 400 F.3d 816, 820 (9th Cir. 2005) ("the indictment

17    charging . . . the substantive offenses of smuggling illegal aliens in violation of 8 U.S.C. § 1324

18    (a)(2)(B)(ii) and 18 U.S.C. § 2, and transporting them in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and

19    18 U.S.C. § 2, was not duplicitous.").

20    Moreover, because the aiding and abetting statute, 18 U.S.C. § 2, provides a means of

21    establishing liability but does not itself define a crime, the count charging Defendant with both aiding

22    and abetting and bringing in illegal aliens for financial gain is not duplicitous.  See Baumann v. United

23    States, 692 F.2d 565, 571 (9th Cir. 1982) (counts of indictment charging both aiding and abetting and

24    mail fraud were not duplicitous).

25            **D.        Section 1324 Is Not Unconstitutional Under *Apprendi***

26    As Defendant recognizes, his argument that Section 1324 is unconstitutional under Apprendi

27    because the trial judge determines the statutory maximum penalties for such an offense rather than the

28    jury is also foreclosed by the Ninth Circuit's decision in United States v. Matus-Leva, 311 F.3d 1214,

1    1217 (9th Cir. 2002)("No genuine issue is presented under Apprendi or its progeny.").  As the Ninth

2    Circuit expressly held there, "[t]his argument is wholly without merit."  Id.

3         The Ninth Circuit explained that the circumstances in Matus-Leva, which also involved an 8

4    U.S.C. Section 1324 "resulting in death" indictment, "do[] not come within the literal terms or the

5    reasoning of Apprendi, because this case does not involve sentencing factors to be decided by a judge

6    that increase the penalty beyond the statutory maximum."  Id

7         **E.    The Court Need Not Apply A *Mens Rea* to the "Sentencing Factors"**

8         As Defendant also recognizes, his argument that the *mens rea* requirements for the various §

9    1324 offenses must attach to the sentencing factors is also foreclosed by United States v. Matus-Leva,

10   311 F.3d at 1218-19 (9th Cir. 2002)("Matus-Leva argues that the 'resulting in . . . death'. . . provision

11   has no explicit *mens rea* requirement, and so it is void for vagueness because it could be applied to a

12   defendant even if the death had nothing to do with the smuggling.  That argument lacks merit.").  In

13   fact, as demonstrated by the analysis in United States v. Nguyen, 73 F.3d 887, 894 (9th Cir. 1995), the

14   Ninth Circuit explained that section 1324 does "have a *mens rea* requirement, namely that the alleged

15   smuggler intend to violate the immigration laws." Id. at 1219.  Thus, the Ninth Circuit rejected this

16   challenge.  Accordingly, this court should deny this motion without further consideration.

17        **F.    The Statute Is Not Unconstitutionally Disproportionate and Vague**

18             **1.    The Absence of Mens Rea Attached to the Death Resulting Factor Does Not
                        Render the Statute Unconstitutionally Disproportionate**

19

20        Defendant claims that, if the court does not impose a mens rea requirement, section

21   1324(a)(1)(B)(iv) is defective because it authorizes the death penalty for conduct that does not satisfy

22   the bare minimum mens rea requirement for imposition of the death penalty – "reckless indifference

23   to human life in the course of committing a violent felony." [Def. Mem. at 13.]

24        In relevant part the portion of section 1324 that Defendant attacks as unconstitutionally

25   disproportionate reads as follows:

26                  (B) A person who violates subparagraph (A) shall, for each alien in respect to
                    whom such a violation occurs –
                    .    .    .    .

27                        (iv) in the case of a violation of subparagraph (A)(I) . . . resulting in the
                         death of any person, be punished by death or imprisoned for any term of
28                       years or for life, fined under Title 18, or both.

1   <u>Id.</u>  This facial constitutional attack on the subparagraph is based on the premise that since the death

2   penalty could be imposed, and since the subparagraph does not narrow the class of persons eligible for

3   the death penalty (i.e., those who at a minimum act with "reckless indifference to human life in the

4   course of committing a violent felony"), the overreaching of the subparagraph makes its

5   disproportionality a constitutional defect.

6       Defendant's complaint appears to be that the statute gives no guidance as to who would be

7   eligible for the death penalty because: (1) "as the '<u>least</u> culpable mental state the Supreme Court has

8   held death eligible is reckless indifference to human life in commission of a felony.'" (Emphasis in

9   original) (Def. Mem. at 14 [<u>quoting</u> <u>United States v. Cheely</u>, 36 F.3d 1439 and n.9 (9th Cir. 1994))]; and

10  (2) the statute does not "genuinely narrow the class of persons eligible for the death penalty." [Def.

11  Mem. at 14.].

12      First, the United States has already informed the court and the parties that the death penalty will

13  not be sought in this case.  Second, while if it is true that section 1324(a)(1)(B)(iv) does not indicate

14  the criteria as to who would be eligible for the death penalty, it does not need to.  All federal death

15  penalty eligible criteria are contained in the Federal Death Penalty Act, 18 U.S.C. § § 3591 et. seq.  <u>See</u>

16  <u>United States v. Fernandez</u>, 231 F.3d 1240, 1243 (9th Cir. 2000).  In fact, the Fifth Circuit has held,

17  "[t]he FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty."

18  <u>United States v. Jones</u>, 132 F.3d 232, 241 (5th Cir. 1998)(Defendant convicted of kidnapping with death

19  resulting, in violation of 18 U.S.C. § 1201.)  That is because "[s]ection 3591(a) codifies the command

20  in <u>Enmund</u>, 458 U.S. at 797, 102 S.Ct. 3368, and <u>Tison</u>, 481 U.S. at 157, 107 S.Ct. 1676, to limit the

21  imposition of the death penalty to those murderers who both undertake felony participation and

22  demonstrate at least reckless indifference to human life."  <u>United States v. Webster</u>, 162 F.3d 308, 355

23  (5th Cir. 1998).  The death penalty is not sought in this case.  Nor is section 1324(a)(1)(B)(iv)

24  unconstitutionally disproportionate.

25
                    **2.    The Absence of Mens Rea Attached to the Death Resulting Factor Does Not**
26                          **Render the Statute Unconstitutionally Vague**

27      As Defendant again recognizes, this argument is precluded by <u>Matus-Leva</u>, 311 F.3d at 1219.

28  In fact, a plain reading of the statute demonstrates that the only prerequisite to the application of the

statute is for an alien to die as a result of a violation of the statute. Surely, an "ordinary person" who reads this statute and then decides to make money by guiding a group of undocumented aliens through treacherous terrain from Mexico into the United States and into a vehicle that crashes killing one or more occupants would not be surprised to learn that he or she was subject to the penalties of this provision. This portion of the statute is hardly, "a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." Kolender v. Lawson, 461 U.S. 352 (1983)(quoting Smith v. Goguen, 415 U.S. 566, 575 (1974)). Likewise, with regard to the financial gain counts of the indictment, the statute is not unconstitutionally vauge. Specifically, it strains credulity to claim that an individual, such as the defendant, who was to be paid for crossing this group of aliens from Mexico into the United States would have any confusion whatsoever as to whether the financial gain provision of the statute would apply to him.

First, "[w]here a law at issue does not implicate First Amendment rights, it may be challenged for vagueness only as applied, unless the enactment is impermissibly vague in all of its applications. Easyriders Foundation F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1493-94 (9th Cir. 1997). Thus, Defendant may only challenge § 1324 only as applied or if it is impermissibly vague in all its applications. Id. The Ninth Circuit has summarily rejected arguments that section 1324 is vague on numerous occasions. See, e.g., United States v. Moreno, 561 F.2d 1321, 1322 (9th Cir. 1977); United States v. Gonzalez-Hernandez, 534 F.2d 1353, 1354 (9th Cir. 1976).

Here, the United States alleges that Defendant was engaged in alien smuggling across the United States border which actively resulted in death. Section 1324 clearly provides notice that this activity is prohibited and will result in specific penalties, and a sufficient guideline that does not encourage arbitrary enforcement by law enforcement officials. Accordingly, section 1324(a)(1)(B)(iv) is not unconstitutionally vague and Defendant is entitled to no relief.

**G.    Defendant's Argument That Counts Be Dismissed Because Congress Did Not Intend Aiding and Abetting Liability Under § 1324 Is Contrary to Binding Ninth Circuit Precedent**

As Defendant here recognizes as well, his arguments are foreclosed by United States v. Angwin, 271 F.3d 786, 800-804 (9th Cir. 2001) (affirming decision to deny the defendant's motion to dismiss

1    the count charging violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2), <u>cert. denied</u>, 535 U.S.

2    966 (2002).

3    **H.    The Indictment Should Not Be Dismissed Because Certain Material Witnesses Were Deported**

4    Defendant has no legal right to the blanket retention of undocumented aliens arrested in

5    conjunction with the alien smuggling charges in this case.  Indeed, once the Government makes a good

6    faith determination that an alien possesses no evidence favorable to a defendant, it is legally *required*

7    to promptly remove the witness.  Defendant Ayala-Ramirez cannot satisfy his burden of showing that

8    the Government acted in bad faith in deporting the aliens or that even one of those witnesses had

9    material, relevant and non-repetitive information or testimony that would be favorable to his defense.

10   <u>See United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 865-72 (1982); <u>see also</u> <u>United States v.</u>

11   <u>Gastelum-Almeida</u>, 298 F.3d 1167, 1174 (9th Cir. 2003)(Defendant bears burden of: (1) proving that

12   Government acted in bad faith by showing "either that the government departed from normal

13   deportation procedures, or that it deported the witnesses to gain an unfair tactical advantage at trial";

14   and (2) making a "plausible showing that the testimony of the deported witnesses would have been

15   material and favorable to his defense, in ways not merely cumulative to the testimony of available

16   witnesses."); <u>United States v. Velarde-Gavarrete</u>, 975 F.2d 672, 675-76 (9th Cir. 1992)(reversing district

17   court's dismissal of indictment and directing that, on remand, district court enter order denying

18   <u>Valenzuela</u> motion and reinstating indictment based upon defendant's failure to establish bad faith).

19   **1.    Defendant Has No Right To The Blanket Retention of All Illegal Alien Witnesses**

20

21   In 1971, the Ninth Circuit held that a defendant had a constitutional right to the retention of all

22   alien witnesses.  <u>See</u> <u>United States v. Mendez-Rodriguez</u>, 450 F.2d 1 (9th Cir. 1971).  Specifically, the

23   Court held that the Government's deportation of illegal alien eyewitnesses, before the defendant had

24   the opportunity to interview them, violated the Fifth and Sixth Amendments to the Constitution, even

25   where the defendant could not show that the missing testimony would have been helpful.  <u>Id.</u>  Eight

26   years later, the Ninth Circuit decided that a defendant can waive this alleged right.  <u>See</u> <u>United States</u>

27   <u>v. Lujan-Castro</u>, 602 F.2d 877 (9th Cir. 1979)

28

1        In 1982, this legal analysis was overruled by the Supreme Court in <u>United States v. Valenzuela-</u>

2   <u>Bernal</u>, 458 U.S. 858 (1982).  In <u>Valenzuela-Bernal</u>, the Supreme Court reversed the Ninth Circuit,

3   which had relied on <u>Mendez-Rodriguez</u> to overturn a defendant's alien smuggling conviction because

4   the aliens had been deported.  In so reversing, the Court held that: (1) the Government has the legal

5   obligation to promptly deport illegal alien witnesses upon its good-faith determination that the

6   witnesses possess no evidence favorable to the defendant; and (2) in order to establish a constitutional

7   violation, a defendant must make a plausible showing that the missing testimony would have been

8   favorable and material, in ways not merely cumulative to the testimony of available witnesses.

9        In reaching its holding, the Court recognized that, in cases such as this, the Government has the

10  dual responsibility of "apprehending and obtaining the conviction of those who have violated criminal

11  statutes" and "deport[ing] other persons involved in the event in order to carry out the immigration

12  policies that Congress has enacted."  <u>Id.</u> at 863-64.  The Court emphasized the fact that the power and

13  authority to regulate immigration has been entrusted "by the Constitution to the political branches of

14  the Federal Government," and that Congress requires that the Government apprehend illegal aliens and

15  promptly deport them.  <u>Id.</u> at 864.  As the Court noted, "Congress has determined that prompt

16  deportation . . . constitutes the most effective method for curbing the enormous flow of illegal aliens

17  across our southern border."  <u>Id.</u> at 866.  Thus, once the Government determines that the alien does not

18  possess exculpatory evidence, the law requires that the alien be deported promptly.

19       Furthermore, the Court upheld the Government's prompt deportation of alien witnesses upon

20  "practical considerations," noting that "the detention of alien witnesses imposes substantial financial

21  and physical burdens upon the Government, not to mention the human cost to potential witnesses who

22  are incarcerated though charged with no crime."  <u>Id.</u> at 865.

23       In addition, the Court repeatedly stated that it is the Government and not the defense which

24  makes the determination of whether a particular alien possesses relevant and material information:

25       "In addition to satisfying immigration policy, the prompt deportation of alien witnesses
         *who are determined by the Government* to possess no material evidence relevant to a
26       criminal trial is justified by several practical considerations."

27       ". . . the Government had good reason to deport respondent's passengers *once it
         concluded* that they possessed no evidence relevant to the prosecution or the defense[.]"

28

                                        27                              07CR2531-W

". . . the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses *upon the Executive's good faith determination* that they possess no evidence favorable to the defendant in a criminal prosecution."

Id. at 865-72 (emphasis added).

Indeed, the Court specifically contemplated that the defendant would not, automatically, be permitted to interview all illegal alien witnesses. The Court rejected the Ninth Circuit's "conceivable benefit" test, and required that, in order for a defendant to establish a constitutional violation, he must make "some plausible showing of how [the aliens'] testimony would have been both material and favorable to his defense." Id. at 867. "The mere fact that the Government deports such witnesses (without being interviewed by defense) is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." Id. at 873-74. Moreover, a defendant is not unfairly prejudiced by the requirement that he demonstrate that the witness's testimony would be helpful. As the Court pointedly noted, "it should be remembered that respondent was present throughout the commission of this crime. No one knows better than he what the deported witnesses actually said to him, or in his presence." Id. at 869.

Shortly after the Supreme Court's decision in Valenzuela-Bernal, the Ninth Circuit specifically acknowledged that Mendez-Rodriguez had been overruled. See United States v. Marquez-Amaya, 686 F.2d 747 (9th Cir. 1982). Indeed, in United States v. Dring, 930 F.2d 687 (9th Cir. 1991), the Ninth Circuit expressly relied on Valenzuela-Bernal to uphold the conviction of a defendant where eleven illegal alien witnesses were not even questioned by Government agents and were deported in accordance with normal procedures. The Ninth Circuit recognized that the Supreme Court applies a two-pronged test of bad faith and prejudice:

Under this two-pronged test, the defendant must make an initial showing that the Government acted in bad faith (in deporting the eyewitness aliens) *and* that this conduct resulted in prejudice to the defendant's case. To prevail under the prejudice prong, the defendant must at least make 'a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.'

Id. at 693 (quoting Valenzuela-Bernal, 458 U.S. at 873).

Furthermore, the Ninth Circuit rejected the defendant's claim that the Government must show that it acted in good faith. Id. at 694 ("If the Government failed to detain and interview the witnesses,

28                                                    07CR2531-W

1    Dring contends, we must presume prejudice to his defense. We agree with the Government that it is

2    the criminal defendant who bears the burden of proving that the Government acted in bad faith");

3    see also Gastelum-Alameida, 298 F.3d at 1174 (Defendant bears burden of proving bad faith; rejecting

4    Defendant's claim that Government must prove good faith).

5         Consequently, the law is now clear that the defendant has no right to the blanket retention of

6    all illegal alien witnesses.

7              **2.    Defendant Had No Legal Right To The Retention of The Aliens In This
                      Case**

8         United States Border Patrol agents are mindful of their "dual responsibility" as described by

9    Valenzuela-Bernal, and several steps are taken to ensure a good faith determination is made as to each

10   alien.  First, based upon an examination of the facts and circumstances of the case and upon the

11   statements of the illegal aliens, the agents make a good-faith determination whether the aliens have any

12   evidence helpful to the defendant.  Second, in an abundance of caution, and not required under any

13   legal theory, defendants are often asked whether they think any of the undocumented aliens may have

14   information favorable to them.[3] If the defendant indicates that any of the undocumented aliens arrested

15   with defendant may have information favorable to him, Government agents will re-evaluate whether

16   or not that alien does, in fact, have any potentially helpful, and non-cumulative, information.

17   Significantly, in this case, agents interviewed each of the undocumented aliens arrested with the

18   defendant, prepared reports concerning each of their statements and properly determined that the aliens

19   who were returned did not have non-repetitive material information favorable to the defendant.

20        Notably, a defendant is not without a remedy if he can make the requisite two-part showing of

21   materiality and bad faith set out in Valenzuela-Bernal.  Indeed, if the defendant can demonstrate that

22   an alien witness has material, relevant, and non-repetitive testimony, and if the defendant can

23   demonstrate that the Government removed that alien in bad faith, then he has a panoply of remedies

24   at his disposal.  He may bring the appropriate motion for sanctions, to dismiss the charge, or for a new

25   trial in the event of conviction. If the Government is in the process of removing the alien – and the

26   defendant can demonstrate that the scheduled removal would be in bad faith – then an appropriate

27

28        [3] As noted above, this form that defendants then sign is commonly, although mistakenly, referred
     to as a Lujan-Castro "waiver" by both the Government and the defense bar.

                                        29                                      07CR2531-W

1   remedy may be a stay of the removal order.  But absent a showing of both materiality and bad faith,

2   these remedies simply do not come into play.  Given that no such showing was made here, no remedy

3   is called for or appropriate.

4          Indeed, Defendant contends only that the removed aliens might possess information material

5   to Defendant's case; in fact, Defendant offers nothing more than mere unbridled speculation to support

6   his motion.  In no way is this a "plausible showing" that his testimony would be favorable and material

7   to the defense as mandated by <u>Valenzuela-Bernal</u>.  Furthermore, Defendant's contention was not

8   supported by a signed affidavit sworn to under oath before a magistrate court – requirements the

9   *Government* must follow when it asserts that an alien's testimony is material in a criminal proceeding,

10  and that, as a result, the witness should be detained pending trial.  <u>See</u> 18 U.S.C. § 3144.

11         In short, <u>Valenzuela-Bernal</u>, <u>Dring</u>, <u>Gastelum-Almeida</u> and <u>Velarde-Gavarrete</u> clearly hold that,

12  absent a showing of both materiality and bad faith, Defendant was not entitled to an order retaining

13  these individuals.  Rather, the Government was bound by Congressional directive to promptly deport

14  those aliens.

15

16         **3.     The Separation of Powers Clause Requires The Denial of Defendant's Motion**

17         This Court is without authority to countermand Congressional directives to the Executive

18  branch and order the continued retention of alien witnesses who have not been shown to possess any

19  evidence relevant and material to the criminal case.  "The Court without exception has sustained

20  Congress' plenary power to make rules for the admissions of aliens."  <u>Valenzuela-Bernal</u>, 458 U.S. at

21  866 (citation omitted).  Pursuant to that power, "Congress has adopted a policy of apprehending illegal

22  aliens at or near the border and deporting them promptly."  <u>Id.</u>  The Separation of Powers clause of the

23  Constitution requires this Court respect this policy, rather than counteract it with an order requiring the

24  blanket retention of illegal aliens.

25

26         **4.     The Practical Impact of Granting Defendant's Motion Would Be Significant**

27         In <u>Valenzuela-Bernal</u>, the Court recognized that, "the prompt deportation of alien witnesses who

28  are determined by the Government to possess no material evidence relevant to a criminal trial is

justified by several practical considerations." Id. at 866.  There, the Court noted that during 1979, "almost one-half of the more than 11,000 inmates incarcerated in federal facilities in the Southern District of California were material witnesses who had neither been charged with nor convicted of a criminal offense."  Id.  The Court further acknowledged that "the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime."  Id.

At present, the Metropolitan Correctional Center ("MCC") operates at over 100% capacity.  The U.S. Marshals Service is able to accommodate this significant level, in part, by contracting out the housing of material witnesses from the MCC to other contract facilities.  Even when material witnesses are kept at MCC and not sent to other contract facilities, there is still a significant cost.  First, the arresting agency must supervise these material witnesses until they are booked into custody.  Once booked into custody, the U.S. Marshals Service must supervise these witnesses.  Additionally, the witnesses are fed, clothed, and medically cared for by the correctional facilities.  In sum, there is a significant "real world" cost to granting Defendant's motion.

Ordering the retention of each and every smuggled alien upon the request of defense counsel will drag the Southern District back to the pre-Valenzuela-Bernal days in which the federal facilities were virtually clogged with illegal aliens who may or may not have any material information.  An important rationale behind the Valenzuela-Bernal decision was to prevent this practical result, and that rationale remains just as valid today.

## I.    The Grand Jurors Were Properly Instructed

### 1.    Introduction

Defendant makes contentions relating to two separate instructions given to the grand jury during its impanelment by District Judge Larry A. Burns on January 10, 2007.  [Memorandum of Points and Authorities, pp. 21-37 (hereinafter "Memorandum")[4]  Although recognizing that the Ninth Circuit in United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir. 2005) (en banc) generally found the two

---

[4]    A "Partial Transcript" of the grand jury proceedings which records the instructions to the impaneled grand jurors after the voir dire had been conducted is supplied with this response.  [Appendix 1.] A redacted "Supplemental Transcript" which records relevant portions of the voir dire proceedings is also provided.  [Appendix 2.]

07CR2531-W

grand jury instructions constitutional, Defendant here contends Judge Burns went beyond the text of the approved instructions, and by so doing rendered them improper to the point that the Indictment should be dismissed.  In fact, the identical arguments advanced by Defendant here were previously rejected in a 12 page written order issued by the Hon. Barry T. Moskowitz in this District, see Order Denying Defendant's Motion to Dismiss the Indictment in United States v. Manuel Martinez-Covarrubias, No. 07cr0491-BTM, filed October 11, 2007 (Appendix 3, hereto).   Moreover, these arguments have explicitly been rejected by the Hon. John A. Houston as well.  See Amended Order Denying Defendant's Motion to Dismiss the Indictment in United States v. Diana Jimenez-Bermudez, 07cr1372-JAH (Appendix 4, hereto).

.       In making his arguments concerning the two separate instructions, Defendant urges this Court to dismiss the Indictment on two separate bases relating to grand jury procedures, both of which were discussed in United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992).  Concerning the first attacked instruction, Defendant urges this Court to dismiss the Indictment by exercising its supervising powers over grand jury procedures. [Memorandum at 27].  This is a practice the Supreme Court discourages as Defendant acknowledges, citing United States v. Williams, 504 U.S. 36, 50 (1992) ("Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure. ").  [Id.]  Isgro reiterated:

> [A] district court may draw on its supervisory powers to dismiss an indictment. The supervisory powers doctrine "is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." Before it may invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct. Absent such prejudice-that is, absent "'grave' doubt that the decision to indict was free from the substantial influence of [the misconduct]"-a dismissal is not warranted.

974 F.2d at 1094 (citation omitted, emphasis added).  Concerning the second attacked instruction, in an attempt to dodge the holding in Williams, Defendant appears to base his contentions on the Constitution as a reason to dismiss the Indictment.  Concerning that kind of a contention Isgro stated:

> [A] court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant." Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and

pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed."

974 F.2d at 1094 (citation omitted).[5/]

The portions of the two relevant instructions approved in <u>Navarro-Vargas</u> were:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal.   That is to be determined by Congress and not by you.

408 F.3d at 1187, 1202.

> The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems.   It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

408 F.3d at 1187, 1206.

Concerning the "wisdom of the criminal laws" instruction, the court stated it was constitutional because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the policy behind a law, then the power to return a no bill in such cases is the clearest form of 'jury nullification.'"[6/]   408 F.3d at 1203 (footnote omitted).   "Furthermore, the grand jury has few tools for informing itself of the policy or legal justification for the law; it receives no briefs or arguments from the parties.   The grand jury has little but its own visceral reaction on which to judge the 'wisdom of the law.'"   <u>Id.</u>

Concerning the "United States Attorney and his Assistant United States Attorneys" instruction, the court stated:

> We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution.   The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . .   The instructions balance the praise for the government's attorney by informing

---

[5]   In <u>Isgro</u> the defendants choose the abrogation of constitutional rights route when asserting that prosecutors have a duty to present exculpatory evidence to grand juries.  They did not prevail. 974 F.2d at 1096 ("we find that there was no abrogation of constitutional rights sufficient to support the dismissal of the indictment."  (relying on <u>Williams</u>)).

[6]   The Court acknowledged that as a matter of fact jury nullification does take place, and there is no way to control it.  "We recognize and do not discount that some grand jurors might <u>in fact</u> vote to return a no bill because they regard the law as unwise at best or even unconstitutional.  For all the reasons we have discussed, there is <u>no post hoc</u> remedy for that; the grand jury's motives are not open to examination."  408 F.3d at 1204 (emphasis in original).

the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207. Id. "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other." Id.

2.    The Expanded "Wisdom of the Criminal Laws" Instruction Was Proper

Concerning whether the new grand jurors should concern themselves with the wisdom of the criminal laws enacted by Congress, Judge Burns' full instruction stated:

You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

But it's not for you to judge the wisdom of the criminal laws enacted by congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is criminal is not up to you. That's a judgment that congress makes.

And if you disagree with the judgment made by congress, then your option is not to say "Well I'm going to vote against indicting even though I think that the evidence is sufficient" or "I'm going to vote in favor of even though the evidence may be insufficient." Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.

Partial Transcript pp. 8-9.[7]

Defendant acknowledges that, in line with Navarro-Vargas, "Judge Bums instructed the grand jurors that they were forbidden 'from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you.'" [Memorandum p. 22.] Defendant notes, however, that "[t]he instructions go beyond that, however, and tell the grand jurors that, should 'you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the

---

[7]    The Supplemental Transcript supplied herewith (Appendix 2) recounts the excusing of the three individuals. This transcript involves the voir dire portion of the grand jury selection process, and has been redacted, to include redaction of the individual names, to provide only the relevant three incidents wherein prospective grand jurors were excused. Specifically, the pages of the Supplemental Transcript supplied are: page 15, line 10 - page 17, line 18; page 24, line 14 - page 28, line 2; page 38, line 9 - page 44, line 17.

1   evidence maybe insufficient.'" [Memorandum p. 22.] Defendant contends that this addition to the

2   approved instruction, "flatly bars the grand jury from declining to indict because the grand jurors

3   disagree with a proposed prosecution." [Memorandum p. 22.] Defendant further contends that the flat

4   prohibition was preemptively reinforced by Judge Burns when he "referred to an instance in the grand

5   juror selection process in which he excused three potential jurors," which resulted in his "not only

6   instruct[ing] the grand jurors on his view of their discretion; [but his] enforc[ing] that view on pain of

7   being excused from service as a grand juror."[8/]  [Memorandum p. 22.]

8       In concocting his theory of why Judge Burns erred, Defendant posits that the expanded

9   instruction renders irrelevant the debate about what the word "should" means. [Memorandum p 29.]

10  Defendant's argument mixes-up two of the holdings in Navarro-Vargas in the hope they will blend into

11  one.  They do not.

12      Navarro-Vargas does permit flatly barring the grand jury from disagreeing with the wisdom of

13  the criminal laws.  The statement, "[y]ou cannot judge the wisdom of the criminal laws enacted by

14  Congress," (emphasis added) authorized by Navarro-Vargas, 408 F.3d at 1187, 1202, is not an

15  expression of discretion.  Jury nullification is forbidden although acknowledged as a sub rosa fact in

16  grand jury proceedings. 408 F.3d at 1204.  In this respect Judge Burns was absolutely within his rights,

17  and within the law, when he excused the three prospective grand jurors because of their expressed

18  inability to apply the laws passed by Congress.  Similarly, it was proper for him to remind the

19  impaneled grand jurors that they could not question the wisdom of the laws.  As we will establish, this

20  reminder did not pressure the grand jurors to give up their discretion not to return an indictment.  Judge

21  Burns' words cannot be parsed to say that they flatly barred the grand jury from declining to indict

22  because the grand jurors disagree with a proposed prosecution, because they do not say that.  That

23  aspect of a grand jury's discretionary power (i.e. disagreement with the prosecution) was dealt with in

24  Navarro-Vargas in its discussion of another instruction wherein the term "should" was germane.[9/]  408

25

26      [8]  See Appendix 2.

27      [9]      That instruction is not at issue here.  It read as follows:

28          [Y]our task is to determine whether the government's evidence as presented
        to you is sufficient to cause you to conclude that there is probable cause to believe
        that the accused is guilty of the offense charged.  To put it another way, you should

F.3d at 1204-06 ("'Should' Indict if Probable Cause Is Found").  This other instruction bestows discretion on the grand jury not to indict.[10/]  In finding this instruction constitutional, the court stated in words that ring true here, "It is the grand jury's position in the constitutional scheme that gives it its independence, not any instructions that a court might offer."  408 F.3d at 1206.  The other instruction was also given by Judge Burns in his own fashion as follows:

> The function of the grand jury, in federal court at least, is to determine probable cause.  That's the simple formulation that I mentioned to a number of you during the jury selection process.  Probable cause is just an analysis of whether a crime was committed and there's a reasonable basis to believe that and whether a certain person is associated with the commission of that crime, committed it or helped commit it.
>
> If the answer is yes, then as grand jurors your function is to find that the probable cause is there, that the case has been substantiated, and it should move forward.  If conscientiously, after listening to the evidence, you say "No, I can't form a reasonable belief has anything to do with it, then your obligation, of course, would be to decline to indict, to turn the case away and not have it go forward.

Partial Transcript pp. 3-4.

> Probable cause means that you have an honestly held conscientious belief and that the belief is reasonable that a federal crime was committed and that the person to be indicted was somehow associated with the commission of that crime.  Either they committed it themselves or they helped someone commit it or they were part of a conspiracy, an illegal agreement, to commit that crime.
>
> To put it another way, you should vote to indict when the evidence presented to you is sufficiently strong to warrant a reasonable person to believe that the accused is probably guilty of the offense which is proposed.

Partial Transcript p. 23.

---

> vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

408 F.3d at 1187.

[10]    The court upheld the instruction stating:

> This instruction does not violate the grand jury's independence.    The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause.    As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause.

408 F.3d at 1205 (confirming holding in United States v. Marcucci, 299 F.3d 1156, 1159 (9th Cir. 2002) (per curiam)).  "In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an indictment.  408 F.3d at 1206.

1    While the new grand jurors were told by Judge Burns that they could not question the wisdom

2    of the criminal laws per <u>Navarro-Vargas</u>, they were also told by Judge Burns they had the discretion

3    not to return an indictment per <u>Navarro-Vargas</u>. Further, if a potential grand juror could not be

4    dissuaded from questioning the wisdom of the criminal laws, that grand juror should be dismissed as

5    a potential jury nullification advocate. <u>See</u> <u>Merced v. McGrath</u>, 426 F.3d 1076, 1079-80 (9th Cir.

6    2005). Thus, there was no error requiring dismissal of this Indictment or any other indictment by this

7    Court exercising its supervisory powers.

8    Further, a reading of the dialogues between Judge Burns and the three excused jurors found in

9    the Supplemental Transcript excerpts (Appendix 2) reflects a measured, thoughtful, almost mutual

10    decision, that those three individuals should not serve on the grand jury because of their views. Judge

11    Burns' reference back to those three colloquies cannot be construed as pressuring the impaneled grand

12    jurors, but merely bespeaks a reminder to the grand jury of their duties.

13    Finally, even if there was an error, Defendant has not demonstrated he was actually prejudiced

14    thereby, a burden he has to bear. "Absent such prejudice--that is, absent 'grave' doubt that the decision

15    to indict was free from the substantial influence of [the misconduct]'--a dismissal is not warranted."

16    <u>Isgro</u>, 974 F.2d at 1094.

17            3.     The Addition to the "United States Attorney and his Assistant United
             States Attorneys" Instruction Did Not Violate the Constitution

18    Concerning the new grand jurors' relationship to the United States Attorney and the Assistant

19    U.S. Attorneys, Judge Burns variously stated:

20        [T]here's a close association between the grand jury and the U.S. Attorney's Office.

21        . . . . You'll work closely with the U.S. Attorney's Office in your investigation
    of cases.

22

23    Partial Transcript p. 11.

    [I]n my experience here in the over 20 years in this court, that kind of tension does not
24        exist on a regular basis, that I can recall, between the U.S. Attorney and the grand
    juries. They generally work together.

25

26    Partial Transcript p. 12.

    Now, again, this emphasizes the difference between the function of the grand
27        jury and the trial jury. You're all about probable cause. If you think that there's
    evidence out there that might cause you to say "well, I don't think probable cause
28        exists," then it's incumbent upon you to hear that evidence as well. As I told you, in

most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

Partial Transcript p. 20.[11]

As a practical matter, you will work closely with government lawyers. The U.S. Attorney and the Assistant U.S. Attorneys will provide you with important services and help you find your way when you're confronted with complex legal matters. It's entirely proper that you should receive the assistance from the government lawyers.

But at the end of the day, the decision about whether a case goes forward and an indictment should be returned is yours and yours alone. If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you.

Partial Transcript pp. 26-27.

Commenting on the phrase, "the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence," Defendant proposes that by making that statement, "Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause." [Memorandum p. 26.] Defendant then ties this statement to the later instruction which "advis[ed] the grand jurors that they 'can expect that the U.S. Attorneys that will appear in front of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you.'" [Memorandum p. 36.] From this lash-up Defendant contends:

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented

---

[11]     Just prior to this instruction, Judge Burns had informed the grand jurors that:

[T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Partial transcript p. 19.

1

represents the universe of all available exculpatory evidence; if there
was more, the duty-bound prosecutor would have presented it.

2

3

The instructions therefore discourage investigation--if exculpatory evidence
were out there, the prosecutor would present it, so investigation is a waste of time and
provide additional support to every probable cause determination: i.e., this case may be
week [sic], but I know that there is nothing on the other side of the equation because it
was not presented.  A grand jury so badly misguided is no grand jury at all under the
Fifth Amendment.

4

5

6

[Memorandum pp. 36-37.]  (Emphasis added.)[12/]

7

Frankly, Judge Burns' statement that "the U.S. Attorneys are duty-bound to present evidence

8

that cuts against what they may be asking you to do if they're aware of that evidence," is directly

9

contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury has no

10

obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor

11

can be said to have a binding obligation to present it."[13/]  (emphasis added)).  See also, United States

12

v. Haynes, 216 F.3d 789, 798 (9th Cir. 2000) ("Finally, their challenge to the government's failure to

13

introduce evidence impugning Fairbanks's credibility lacks merit because prosecutors have no

14

obligation to disclose 'substantial exculpatory evidence' to a grand jury."  (citing Williams) (emphasis

15

added)).

16

17

_____

18

[12]     The term "presumption" is too strong a word in this setting.  The term "inference" is
more appropriate.  See McClean v. Moran, 963 F.2d 1306 (9th Cir. 1992) which states there are (1)
permissive inferences; (2) mandatory rebuttable presumptions; and (3) mandatory conclusive
presumptions, and explains the difference between the three.  963 F.2d at 1308-09 (discussing
Francis v. Franklin, 471 U.S. 314 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979); and Ulster
County Court v. Allen, 442 U.S. 140, 157 & n. 16 (1979)).  See also United States v. Warren, 25
F.3d 890, 897 (9th Cir. 1994).

19

20

21

22

[13]     Note that in Williams the Court established:

23

Respondent does not contend that the Fifth Amendment itself obliges the
prosecutor to disclose substantial exculpatory evidence in his possession to the grand
jury.  Instead, building on our statement that the federal courts "may, within limits,
formulate procedural rules not specifically required by the Constitution or the
Congress,"  he argues that imposition of the Tenth Circuit's disclosure rule is
supported by the courts' "supervisory power."

24

25

26

504 U.S. at 45 (citation omitted).  The Court concluded, "we conclude that courts have no authority
to prescribe such a duty [to present exculpatory evidence] pursuant to their inherent supervisory
authority over their own proceedings." 504 U.S. at 55.  See also, United States v. Haynes, 216 F.3d
789, 797-98 (9th Cir. 2000).  However, the Ninth Circuit in Isgro used Williams' holding that the
supervisory powers would not be invoked to ward off an attack on grand jury procedures couched
in constitutional terms. 974 F.2d at 1096.

27

28

1    However, the analysis does not stop there. Prior to assuming his judicial duties, Judge Burns

2  was a member of the United States Attorney's Office, and made appearances in front of the federal

3  grand jury.[14] As such he was undoubtedly aware of the provisions in the United States Attorneys'

4  Manual ("USAM").[15] Specifically, it appears he is aware of USAM Section 9-11.233 thereof which

5  reads:

6    In <u>United States v. Williams</u>, 112 S.Ct. 1735 (1992), the Supreme Court held
    that the Federal courts' supervisory powers over the grand jury did not include the
7    power to make a rule allowing the dismissal of an otherwise valid indictment where the
    prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the
8    <u>policy</u> of the Department of Justice, however, that when a prosecutor conducting a
    grand jury inquiry is personally aware of <u>substantial evidence that directly negates the</u>
9    <u>guilt</u> of a subject of the investigation, the prosecutor <u>must present or otherwise disclose</u>
    such evidence to the grand jury before seeking an indictment against such a person.
10   While a failure to follow the Department's policy should <u>not result in dismissal of an</u>
    <u>indictment</u>, appellate courts <u>may refer violations of the policy to the Office of</u>
11   <u>Professional Responsibility</u> for review.

12  (Emphasis added.)[16] This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure of

13  Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede the

14  policy that requires prosecutors to disclose '<u>substantial evidence</u> that directly negates the guilt of a

15  subject of the investigation' to the grand jury before seeking an indictment, <u>see</u> USAM § 9-11.233 ."

16  (Emphasis added.)[17]

17

18    [14]    He recalled those days when instructing the new grand jurors. [Partial Transcript pp.
19  12, 14-16, 17-18.]

20    [15]    The USAM is available on-line at www.usdoj.gov/usao/eousa/foia_reading_room/
    usam/index.html.

21    [16]    <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm. Even
22  if Judge Burns did not know of this provision in the USAM while he was a member of the
    United States Attorney's Office, because of the accessability of the USAM on the internet, as the
23  District Judge overseeing the grand jury he certainly could determine the required duties of the
    United States Attorneys appearing before the grand jury from that source.

24    [17]

25    <u>See</u>    www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm.
    Similarly, this new section does not bestow any procedural or substantive rights on defendants.

26    Under this policy, the government's disclosure will exceed its constitutional
27    obligations. This expanded disclosure policy, however, does not create a general
    right of discovery in criminal cases. Nor does it provide defendants with any
    additional rights or remedies.
28
  USAM 9-5.001, ¶ "E". <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm.htm.

1    The facts that Judge Burns' statement contradicts <u>Williams</u>, but is in line with self-imposed

2    guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant.

3    No improper presumption/inference was created when Judge Burns reiterated what he knew to be a

4    self-imposed duty to the new grand jurors.  Simply stated, in the vast majority of the cases the reason

5    the prosecutor does not present "substantial" exculpatory evidence, is because no "substantial"

6    exculpatory evidence exists.[18]  If it does exist, as mandated by the USAM, the evidence should be

7    presented to the grand jury by the Assistant U.S. Attorney upon pain of possibly having his or her

8    career destroyed by an Office of Professional Responsibility investigation.  Even if there is some

9    nefarious slant to the grand jury proceedings when the prosecutor does not present any "substantial"

10   exculpatory evidence, because there is none, the negative inference created thereby in the minds of the

11   grand jurors is legitimate.  In cases such as Defendant's, the Government has no "substantial"

12   exculpatory evidence generated from its investigation or from submissions tendered by the defendant.[19]

13   There is nothing wrong  in this scenario with a grand juror inferring from this state-of-affairs that there

14   is no "substantial" exculpatory evidence, or even if some exculpatory evidence were presented, the

15   evidence presented represents the universe of all available exculpatory evidence.

16   Further, just as the instruction language regarding the United States Attorney attacked in

17   <u>Navarro-Vargas</u> was found to be "unnecessary language [which] does not violate the Constitution," 408

18   F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand jury

19   concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys, and does

20   not violate the Constitution.  In <u>United States v. Isgro</u>, 974 F.2d 1091 (9th Cir. 1992), the Ninth Circuit

21

22      [18]      Recall Judge Burns also told the grand jurors that:

23      [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-
        blown trial, you're likely in most cases not to hear the other side of the story, if there
24      is another side to the story.

25   Partial transcript p. 19.

26      [19]    Realistically, given "that the grand jury sits not to determine guilt or innocence, but to assess
        whether there is adequate basis for bringing a criminal charge [i.e. only finding probable cause],"
27   <u>Williams</u>, 504 U.S. at 51 (citing <u>United States v. Calandra</u>, 414 U.S. 338, 343-44 (1974)), no
        competent defense attorney is going to preview the defendant's defense story prior to trial assuming
28   one will be presented to a fact-finder.  Therefore, defense submissions to the grand jury will be few
        and far between.

while reviewing <u>Williams</u> established that there is nothing in the Constitution which requires a prosecutor to give the person under investigation the right to present anything to the grand jury (including his or her testimony or other exculpatory evidence), and the absence of that information does not require dismissal of the indictment. 974 F.2d at 1096 ("<u>Williams</u> clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations."). That the USAM imposes a duty on United States Attorneys to present "substantial" exculpatory evidence to the grand jury is irrelevant since by its own terms the USAM excludes defendants from reaping any benefits from the self-imposed policy.[20] Therefore, while the "duty-bound" statement was an interesting tidbit of information, it was unnecessary in terms of advising the grand jurors of their rights and responsibilities, and does not cast an unconstitutional pall upon the instructions which requires dismissal of the indictment in this case or any case. The grand jurors were repeatedly instructed by Judge Burns that, in essence, the United Sates Attorneys are "good guys," which was authorized by <u>Navarro-Vargas</u>. 408 F.3d at 1206-07 ("laudatory comments . . . not vouching for the prosecutor"). But he also repeatedly "remind[ed] the grand jury that it stands between the government and the accused and is independent," which was also required by <u>Navarro-Vargas</u>. 408 F.3d at 1207. In this context the unnecessary "duty-bound" statement does not mean the instructions were constitutionally defective requiring dismissal of this indictment or any indictment.

The "duty bound" statement constitutional contentions raised by Defendant do not indicate that the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." <u>Isgro</u>, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

---

[20] The apparent irony is that although an Assistant U.S. Attorney will not lose a case for failure to present exculpatory information to a grand jury per <u>Williams</u>, he or she could lose his or her job with the United States Attorney's Office for such a failure per the USAM.

1    **J.    The Court Should Not Bifurcate The Trial Of This Matter**

2         Defendant claims that the court should bifurcate the trial of the "resulting in death" sentencing

3    factor from the remaining issues in the case.  He moves the court for this relief pursuant to Fed. R.

4    Crim. P. 8 and 14, which read in pertinent part as follows:

5              Rule 8:

6                   (a) Two or more offenses may be charged in the same indictment. . . if the
                    offenses charged, . . . are based on the same act or transaction.
7              Rule 14:

8                   If it appears that a <u>defendant</u> . . . is <u>prejudiced</u> by a joinder of offenses. . ., the
                    court <u>may</u> order . . . separate trials of counts, . . . or provide whatever other
9                   relief justice requires.

10   <u>Id.</u> (Emphasis added.)

11        Ramirez-Ayala bears the burden of showing manifest prejudice.  In fact, the best that Defendant

12   can offer here is the discussion found in a footnote in the concurring opinion of Justice Thomas in

13   <u>Apprendi</u>.  That footnote reads as follows:

14                  In addition, it has been common practice to address this concern [introduction
                    of prior conviction at trial] by permitting the defendant to stipulate to the prior
15                  conviction, in which case the charge of the prior conviction is not read to the jury, or
                    , if the defendant decides not to stipulate, to bifurcate the trial, with the jury only
16                  considering the prior conviction after it has reached a guilty verdict on the core crime.

17   530 U.S. at 521 n.10 (citations omitted).  First, according to Justice Thomas, this is a "practice," but

18   it its not required.  Second, the Ninth Circuit has, in fact, found the scenario addressed in the footnote

19   does not require severance/bifurcation, and a district court does not abuse its discretion when it refuses

20   to so order.  <u>United States v. Nguyen</u>, 88 F.3d 812, 818 (9th Cir. 1996).  Moreover, the interests of

21   judicial economy in this case are significant given the overlap in witnesses and testimony in the

22   "resulting in death" counts and the other counts under 8 U.S.C. § 1324.  <u>See</u> <u>Matus-Leva</u>, 311 F.3d at

23   1217 ("Bifurcation of proceeding relating to death of the aliens he guided would have been judicially

24   inefficient and was not necessary to give Matus-Leva a fair trial.").

25
     **K.    Defendant's Statements Should Not Be Suppressed As There Was No**
26   **Unreasonable Delay In Securing a Probable Cause Determination**

27        First, the delay in presenting Ramirez-Ayala's matter to the Magistrate Judge for a probable

28   cause determination was not more than 48 hours.  Defendant was transferred from the hospital into

1  custody on October 2, 2008 at approximately 12:30 p.m.  On October 3, 2008 the Magistrate Judge

2  signed off on the probable cause statement and Complaint.  Therefore, the literal terms of <u>McLaughlin</u>,

3  500 U.S. at 56, were not violated.  In fact, between September 1, 2008 when the rollover accident

4  occurred and October 2, 2008, Defendant Ramirez-Ayala was hospitalized.  He was initially

5  determined to be in critical condition with a head injury; he subsequently made significant progress to

6  the point where his doctors informed Border Patrol agents that he was fit for travel and incarceration

7  shortly before his October 2, 2008 transfer.  As the Ninth Circuit held in <u>Matus-Leva</u>, 311 F.3d at 1217:

8  . . . we reject [defendant's] contention that the district court erred in denying his motion
   to dismiss the indictment based on the delay between the time [defendant] was arrested
9  and when he was granted a probable cause determination.  Here, for much of the period
   at issue, the government was engaged in rescuing and providing medical treatment to
10  aliens whom [defendant] had been guiding. . .. Any resulting delay was reasonable.

11  In fact, "in evaluating whether the delay in a particular case is unreasonable, however, courts must

12  allow a substantial degree of flexibility."  <u>McLaughlin</u>, 500 U.S. at 56-57.  In fact, in this case, the

13  Border Patrol acted properly and cautiously with the medical condition of the defendant being taken

14  into primary consideration.  Here, the Border Patrol took steps to care for the victims of the rollover

15  accident including, but not limited to, Defendant Ramirez-Ayala.  Thus, the Border Patrol did the right

16  thing for the right reasons at the right time.  Accordingly, even if this court considers any delay from

17  the time of the rollover crash, such delay was reasonable.

18
   **L.    The Indictment Should Not Be Dismissed, Or Statements Suppressed Due to**
19  **Pre-Arraignment Delay**

20  The defendant bears the burden of proving grounds for exclusion for alleged violations of Fed.

21  R. Crim. P. 5(a) and 18 U.S.C. § 3501(c).  <u>United States v. Van Poyck</u>, 77 F.3d 285, 288 (9th Cir.

22  1996)(citing <u>United States v. Halbert</u>, 436 F.2d 1226, 1230 (9th Cir. 1970)).

23  Federal Rule of Criminal Procedure 5(a) requires "[a]n officer making an arrest under
   a warrant. . . [to] take the arrested person without unnecessary delay before the nearest
24  available federal magistrate judge. . ." Fed. R. Crim. P. 5(a).  Courts look to 18 U.S.C.
   § 3501(c) to determine whether pre-arraignment statements obtained in violation of
25  Rule 5(a) are admissible.

26  <u>Van Poyck</u>, 77 F.3d at 288 (citations omitted).  Section 3501(c) provides that the six hour time

27  limitation "shall not apply in cases in which the delay in bringing such person before such magistrate

28  or other officer beyond such six-hour period is found by the trial judge to be reasonable considering

1    the means of transportation and the distance to be traveled to the nearest available such magistrate or

2    other officer." Id. at 288.  Moreover, the Ninth Circuit has held that, "we will admit a statement made

3    outside of the safe harbor if the delay was reasonable or if public policy concerns weight in favor of

4    admission." Mendoza, 157 F.3d at 731.

5         As the Ninth Circuit explained in Matus-Leva, 311 F.3d at 1217:

6              In the circumstances of this case, which included providing him medical treatment, the
               delay was neither unreasonable nor contrary to public policy.  See, e.g., United States
7              v. Van Poyck, 77 F.3d 285, 288-89 (9th Cir. 1996).  Accordingly, the district court did
               not err in declining to suppress the statements on the basis of pre-arraignment delay.

8

9         Here, the Border Patrol took steps to care for the victims of the rollover accident including but

10   not limited to Defendant Ramirez-Ayala.  Thus, the Border Patrol did the right thing for the right

11   reasons at the right time.  In the grand scheme of things, Defendant's statutory rights had to take a

12   backseat to more important logistical and humanitarian concerns.  Public policy demands the delay be

13   excused here.  It is Ramirez's burden to prove otherwise and unless he can satisfy "his burden of proof.

14   . . . his statments [are] properly admitted." Van Poyck, 77 F.3d at 290; see also Mendoza, 157 F.3d at

15   732.

16        **M.    Defendant's Statements Should Not Be Suppressed**

17        The Government carries its burden when it establishes by a preponderance of the evidence that

18   the confession was voluntary.  United States v. Gordon, 974 F.2d 1110, 1114 (9th Cir. 1992); United

19   States v. Kelley, 953 F.2d 562, 564 (9th Cir. 1992):

20             A voluntary statement is one that is the product of a rational intellect and free will.  No
               one factor is determinative.  Instead, the "totality of the circumstances' must be
21             considered.

22   Kelley, 953 F.2d at 564.  "[T]he question to be faced in each case is whether the defendant's will was

23   overborne when he confessed." United States v. Jenkins, 938 F.2d 934 (9th Cir. 1991).  "Coercive

24   [police] activity is 'a necessary predicate' to finding a confession involuntary." Claibourne v. Lewis,

25   64 F.3d 1373, 1379 (9th Cir. 1995)(quoting Kelley, 953 F.2d at 565).  If a complaining defendant cannot

26   point to any evidence of coercion by the police, he cannot establish his confession was involuntary. Id.

27        Here, there is no evidence of Ramirez-Ayala's will being overborne and/or coercive police

28   activity.  See Matus-Leva, 311 F.3d at 1217 (where defendant's rights and consequences of waiver

1    slowly and carefully explained to him in Spanish, "the totality of the circumstances did not suggest that

2    the government obtained the statements by physical or psychological coercion or other improper

3    inducement.").  Defendant's motion to suppress statements should be denied without an evidentiary

4    hearing because he failed to allege a specific factual dispute, and failed to support his contentions with

5    a sworn declaration as required by Crim LR 47.1(g).

6              **1.     Knowing, Intelligent, and Voluntary Miranda Waiver**

7              A statement made in response to custodial interrogation is admissible under Miranda v. Arizona,

8    384 U.S. 437 (1966), and 18 U.S.C. § 3501 if a preponderance of the evidence indicates that the

9    statement was made after an advisement of Miranda rights, and was not elicited by improper coercion.

10   See Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs

11   voluntariness and Miranda determinations; valid waiver of Miranda rights should not be found in the

12   "absence of police overreaching").

13             A valid Miranda waiver depends on the totality of the circumstances, including the background,

14   experience, and conduct of the  defendant.  North Carolina v. Butler, 441 U.S. 369, 374-75 (1979).

15   To be knowing and intelligent, "the waiver must have been made with a full awareness of both the

16   nature of the right being abandoned and the consequences of the decision to abandon it." Moran v.

17   Burbine, 475 U.S. 412, 421 (1986). The Government bears the burden of establishing the existence of

18   a valid Miranda waiver. North Carolina v. Butler, 441 U.S. at 373.  In assessing the validity of a

19   defendant's Miranda waiver, this Courts should analyze the totality of the circumstances surrounding

20   the interrogations.  See Moran v. Burbine, 475 U.S. at 421.   Factors commonly considered include:

21   (1) the defendant's age (see United States v. Doe, 155 F.3d 1070, 1074-75 (9th Cir. 1998) (en banc)

22   (valid waiver because the 17 year old defendant did not have trouble understanding questions, gave

23   coherent answers, and did not ask officers to notify parents), (2) the defendant's familiarity with the

24   criminal justice system (see United States v. Williams, 291 F.3d 1180, 1190 (9th Cir. 2002) (waiver

25   valid in part because defendant was familiar with the criminal justice system from past encounters),

26   (3) the explicitness of the Miranda waiver (see United States v. Bernard S., 795 F.2d 749, 753 n.4 (9th

27   Cir. 1986) (a written Miranda waiver is "strong evidence that the waiver is valid"); United States v.

28   Amano, 229 F.3d 801, 805 (9th Cir. 2000) (waiver valid where Miranda rights were read to defendant

1    twice and defendant signed a written waiver), and (4) the time lapse between the reading of the

2    <u>Miranda</u> warnings and the interrogation or confession.  <u>See</u> <u>Guam v. Dela Pena</u>, 72 F.3d 767, 769-70

3    (9th Cir. 1995) (valid waiver despite 15-hour delay between <u>Miranda</u> warnings and interview).

4        Here, the Border Patrol agents advised Defendant of his <u>Miranda</u> rights prior to any post-arrest

5    custodial interrogation.  As evidenced by the digital video recording, Defendant was advised of his

6    <u>Miranda</u> rights before the interrogation.  Defendant orally agreed to waive his <u>Miranda</u> rights and

7    agreed to answer questions.  Based on the totality of the circumstances, Defendant's statements should

8    not be suppressed.

9                **2.    Defendant's Statements Were Voluntary**

10        The inquiry into the voluntariness of statements is the same as the inquiry into the voluntariness

11   of a waiver of <u>Miranda</u> rights. <u>See</u> <u>Derrick v. Peterson</u>, 924 F.2d 813, 820 (9th Cir.1990).   Courts look

12   to the totality of the circumstances to determine whether the statements were "the product of free and

13   deliberate choice rather than coercion or improper inducement." <u>United States v. Doe</u>, 155 F.3d 1070,

14   1074(9th Cir. 1998)(<u>en</u> <u>banc</u>).

15        A confession is involuntary if "coerced either by physical intimidation or psychological

16   pressure."  <u>United States v. Crawford</u>, 372 F.3d 1048, 1060 (9th Cir. 2004) (quoting <u>United States v.</u>

17   <u>Haswood</u>, 350 F.3d 1024, 1027 (9th Cir. 2003)).  In determining whether a defendant's confession was

18   voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed.'"

19   <u>Clark v. Murphy</u>, 331 F.3d 1062, 1072 (9th Cir.), <u>cert. denied</u>, _ U.S. _, 124 S. Ct. 446 (2003) (<u>quoting</u>

20   <u>Haynes v. Washington</u>, 373 U.S. 503, 513 (1963)). Psychological coercion invokes no per se rule.

21   <u>United States v. Miller</u>, 984 F.2d 1028, 1030 (9th Cir. 1993). Therefore, the Court must "consider the

22   totality of the circumstances involved and their effect upon the will of the defendant."  <u>Id.</u> at 1031

23   (<u>citing</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973)).

24        In determining the issue of voluntariness, this Court should consider the five factors under 18

25   U.S.C. § 3501(b).  <u>United States v. Andaverde</u>, 64 F.3d 1305, 1311 (9th Cir. 1995).  These five factors

26   include: (1) the time elapsing between arrest and arraignment of the defendant making the confession,

27   if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the

28   offense with which he or she was charged or of which he was suspected at the time of making the

1    confession, (3) whether or not such defendant was advised or knew that he or she was not required to

2    make any statement and that any such statement could be used against him, (4) whether or not such

3    defendant had been advised prior to questioning of his or her right to the assistance of counsel; and (5)

4    whether or not such defendant was without the assistance of counsel when questioned and when giving

5    such confession. 18 U.S.C. § 3501(b). All five statutory factors under 18 U.S.C. § 3501(b) need not

6    be met to find the statements were voluntarily made. See Andaverde, 64 F.3d at 1313.

7        As discussed above, Defendant was read his Miranda rights and explicitly stated that he

8    understood his Miranda rights and agreed to waive those rights. See United States v. Gamez, 301 F.3d

9    1138, 1144 (9th Cir. 2002). Defendant's statements were not the product of physical intimidation or

10   psychological pressure of any kind by any Government agent. There is no evidence that Defendant's

11   will was overborne at the time of his statements. Consequently, Defendant's motion to suppress his

12   statements as involuntarily given should be denied.

13                 **3.        Defendant's Motion Should Be Denied Without An Evidentiary Hearing**

14       This Court can and should deny (without prejudice) Defendant's motion to suppress statements

15   without an evidentiary hearing. First, under Ninth Circuit precedent as well as Southern District Local

16   Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to suppress

17   only when the defendant adduces specific facts sufficient to require the granting of the defendant's

18   motion. United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) ("[T]he defendant, in his motion

19   to suppress, failed to dispute any material fact in the government's proffer. In these circumstances, the

20   district court was not required to hold an evidentiary hearing.").

21       Second, an evidentiary hearing is not required if a defendant's motion to suppress and

22   supporting declarations or affidavits fail to allege a specific factual dispute. See United States v.

23   Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (an evidentiary hearing is required "if the moving papers

24   are definite, specific, detailed and nonconjectural to enable the court to conclude that contested issues

25   of [material] fact . . . are at issue"); see United States v. Howell, 231 F.3d 616, 620-23 (9th Cir. 2000)

26   (holding that "[a]n evidentiary hearing on a  motion to suppress need be held only when the moving

27   papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to

28   conclude that contested issues of fact exist."); United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir.

1    1989) (District Court is not required to hold an evidentiary hearing where "defendant, in his motion

2    to suppress, failed to dispute any material fact in the government's proffer"); United States v. Moran-

3    Garcia, 783 F. Supp. 1266, 1274 (S.D. Cal. 1991) (motion to suppress "akin to boilerplate motions that

4    lay no factual foundation" and unsworn representations of counsel were "too indefinite and conjectural

5    to require the government to respond").

6           Defendant  failed to specifically identify the statements that he seeks to suppress or allege any

7    specific factual or legal dispute regarding the admissibility of the statements.  Defendant did not allege

8    that the Border Patrol agents failed to advise Defendant of his Miranda rights, that the Miranda rights

9    provided were somehow defective, that his Miranda waivers were not knowingly, intelligently, or

10   voluntarily made, or that the statements were involuntarily coerced.

11

12        **N.    The Pre-Trial Identifications By The Material Witnesses Were Not Unduly
              Suggestive And The Resulting Identification of Defendant Is Reliable.**

13          Defendant contends the pre-trial identifications by the material witnesses were so unduly

14   suggestive they should be suppressed.   Moreover, he contends that any subsequent in-court

15   identification should be suppressed for the same reason.  As set forth below, Defendant has not

16   demonstrated that the pre-trial identification procedures were unduly suggestive or that the resulting

17   identification of Defendant is unreliable. As such, his motion to suppress should be denied.  Likewise,

18   his motion to suppress any future in-court identification should be denied.

19                       **1.     Standards Governing Identification Testimony**

20          In this Circuit, courts apply a two-step process when evaluating a claim that a pretrial

21   identification must be suppressed.  First, a defendant bears the burden of proving that the identification

22   procedure was impermissibly suggestive.  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  "To

23   determine whether an identification procedure is so impermissibly suggestive as to taint identification

24   testimony in deprivation of defendant's due process rights, [the court] examine[s] the "totality of the

25   surrounding circumstances."   United States v. Nash, 946 F.2d 679, 681 (9th Cir. 1991).   If the

26   identification procedure was not impermissibly suggestive, the court's inquiry ends.  United States v.

27   Bagley, 772 F.2d 482, 492 (9th Cir. 1988).  If there is impermissible suggestion, "it must then be

28

1    determined whether the identification was nonetheless reliable." United States v. Love, 746 F.2d 477,

2    478 (9th Cir. 1984); see also United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985).

3        The fact that a confrontation is suggestive does not establish a violation of due process.

4    Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995). Rather, the question is whether the confrontation

5    "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant]

6    was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Even if the court

7    determines that the identification procedure is impermissibly suggestive, automatic exclusion of the

8    identification testimony is not required. The court must determine whether the testimony is nonetheless

9    reliable. Manson v. Braithwaite, 432 U.S. 98, 113-114 (1977); Neil v. Biggers, 409 U.S. 188, 196

10   (1972). To determine reliability, courts consider the five factors enumerated in Biggers: "(1) the

11   witness's opportunity to view the criminal at the time of crime; (2) the witness's degree of attention;

12   (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty

13   demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the

14   confrontation." United States v. Jones, 84 F.3d 1206, 1209-10 (9th Cir. 1996) (citing Biggers, 409 U.S.

15   at 199-200)..

16
17               **2.    The Photographic Line-Up Identification Of Defendant Was Not
                          Impermissibly Suggestive**

18       Defendant fails to demonstrate how, if at all, the photo array used in this case was

19   impermissibly suggestive. Photographs of all those detained as part of the crash were shown to the

20   material witnesses, and the witnesses were asked to identify each of them. These photographs included

21   pictures of the two deceased individuals and those who were severely injured.   Given the

22   circumstances, the only available photographs of Defendant Ramirez-Ayala and co-defendant Adan

23   Padilla-Vasquez showed their visible injuries, tubes, neck braces and other hospital equipment.

24   Photographs at different angles were taken of those individuals to afford the material witnesses a fair

25   opportunity to fully view them.   The material witnesses were asked to separate the photos into two

26   piles – those individuals that crossed on foot with them and those that did not. Most, if not all, of the

27   material witnesses provided accurate physical descriptions of the Defendant.  Upon viewing the

28   photographs, each material witness positively identified the foot guides, including Defendant Ramirez-

Ayala, without hesitation. In fact, the material witnesses consistently stated that they did not recognize the other person appearing severely injured in the photographs (although they indicated he did not cross on foot with the group); thus, the photographs were not, in fact, overly or unduly suggestive.

Even where none of the pictures in a traditional photographic array depicted persons similar in appearance to the defendant, that has not made a line-up impermissibly suggestive. See United States v. Monk, 774 F.2d 945 (9th Cir. 1985) (although none of the other individuals depicted in photo array had appearances similar to defendant, procedure was not impermissibly suggestive where witnesses were not told that the suspect would be among the photos or that they had picked the "right one"); see also, United States v. Carbajal, 956 F.2d 924 (9th Cir. 1992) (although defendant was wearing a wig and was the only person with bruises, photo spread was not impermissibly suggestive); United States v. Nash, 946 F.2d 679 (9th Cir. 1991) (photo spread not suggestive despite differences in photographs, i.e., different hairstyles, ethnicity and complexions); United States v. Hamilton, 792 F.2d 837, 840-41 (9th Cir. 1986) (photographic display not unduly suggestive even though two of the six photos were of the same person and two others were nearly identical; due process "not violated unless the photographic display results in a very substantial likelihood of irreparable misidentification in light of the totality of the circumstances"); United States v. Johnson, 820 F.2d 1065 (9th Cir. 1987) (pre-trial photo line-up not impermissibly suggestive even though defendant was the only person in the line-up over 30, two other persons were noticeably more clean shaven, and the photo of defendant was hazier than the other photos). In this case, the method used by the agents to identify Defendant was used because each of the individuals involved in the crash needed to be identified.

Here, because the photographs depicted everyone from the crash and the material witnesses were requested to assist in the identification of all the individuals instead of looking for a specific person, Defendant cannot meet the first prong of showing the pre-trial identification was impermissibly suggestive. As such, Defendant's motion should be denied without an evidentiary hearing.

### 3.    The Identification Testimony Is Reliable

Even if this Court determines that the challenged identification procedure was impermissibly suggestive, in-court identification testimony is still admissible because the reliability of the

1  identification outweighs any suggestiveness in the procedure.  An examination of all the factors set

2  forth in <u>Biggers</u> establish that the material witness identifications are, in fact, reliable.

3          First, the material witnesses had ample opportunity to view the Defendant at the time of the

4  crime as he met them in Mexico; led them on foot across the International Border into the United

5  States; and loaded them into the vehicle that subsequently rolled over.  They walked with him on foot

6  for some time; they waited with him for some time before the group actually crossed the border; and

7  they again waited with him while they were anticipating the arrival of the vehicle into which he helped

8  to load them.[21]  Given the chronology in this case, the material witnesses had ample time and

9  opportunity to view the Defendant.  In fact, one of the material witnesses traveled back across the

10  border into Mexico with Defendant when the material witness' wife could not continue and Defendant

11  then escorted him back into the United States into the vehicle that ultimately rolled over.  The facts

12  establish that the material witnesses were able to get a good look at Defendant.

13          The material witnesses described the foot guide and their high  level of certainty concerning

14  the identification also establishes that the identification is reliable.  After viewing the photographs, all

15  of them immediately identified Defendant as one of the two foot guides.  Finally, the identification

16  occurred within two days of the accident, as soon as photographs of all individuals were available and

17  upon the material witness' release from hospitals, while the events were still fresh in their minds.  <u>See</u>

18  <u>United States v. Simoy</u>, 998 F.2d 751, 752 (9th Cir. 1993) (identification by witness six days after

19  crime reliable).

20          In sum, in light of the factors considered above, there is not a substantial likelihood of

21  misidentification by the material witnesses's identification of the Defendant.

22          **O.      The Government Does Not Oppose Leave To File Further Motions, So Long As
                 They Are Based on New Evidence**

23

24          The Government does not object to the granting of leave to file further motions as long as the

25  order applies equally to both parties and any additional defense motions are based on newly discovered

26  evidence or discovery provided by the Government subsequent to the instant motion.

27

28  _____

[21]<u>See</u> <u>United State v. Madrid</u>, 189 F.3d 475 (9th Cir. 1999)(unpublished) (Although the material
witness only glanced two or three times at the defendant who was standing next to the hood of the
vehicle as he climbed into the engine compartment, his identification of the defendant was reliable).

## IV

## GOVERNMENT'S MOTION TO COMPEL RECIPROCAL DISCOVERY

### A.    All Evidence That Defendant Intends To Introduce In His Case-In-Chief

Since the Government will honor Defendant's request for disclosure under Rule 16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1).  Pursuant to Rule 16(b)(1), requests that Defendant permit the Government to inspect, copy and photograph any and all books, papers, documents, photographs, tangible objects, or make copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession and control of Defendant, which he intends to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom Defendant intends to call as a witness.  The Government also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the Government receives the reciprocal discovery to which it is entitled.

### B.    Reciprocal Jencks – Statements By Defense Witnesses

Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires production of the prior statements of all witnesses, except a statement made by Defendant.  The time frame established by Rule 26.2 requires the statements to be provided to the Government after the witness has testified.  However, to expedite trial proceedings, the Government hereby requests that Defendant be ordered to provide all prior statements of defense witnesses by a reasonable date before trial to be set by the Court.  Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

07CR2531-W

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V**

**CONCLUSION**

For the foregoing reasons, the United States requests that the Court deny Defendant's motions and grant the United States' motion for reciprocal discovery.

Dated: June 11, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

*s/Lawrence A. Casper*

LAWRENCE A. CASPER
Assistant U.S. Attorney

07CR2531-W

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 07CR2531-W |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| ALFREDO ENRIQUE RAMIREZ-AYALA, | ) | |
| | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Lawrence A. Casper, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of

UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO:

1) PRESERVE EVIDENCE; (2) COMPEL DISCOVERY; (3) DISMISS COUNTS 1,3,6,9,12 AND 15; (4) DISMISS INDICTMENT (APPRENDI); (5) DISMISS ALL COUNTS (MENS REA); (6) DISMISS "RESULTING IN DEATH" CHARGE AS UNCONSTITUTIONAL; (7) DISMISS AIDING & ABETTING COUNTS; (8) DISMISS INDICTMENT BECAUSE SOME SMUGGLED ALIENS WERE DEPORTED; (9) DISMISS INDICTMENT (GRAND JURY MISINSTRUCTION); (10) BIFURCATE THE TRIAL; (11) SUPPRESS STATEMENTS (GERSTEIN); (12) SUPPRESS STATEMENTS FOR PRE-ARRAIGNMENT DELAY; (13) SUPPRESS STATEMENTS (MIRANDA); (14) SUPPRESS ID TESTIMONY; and (15) FILE FURTHER MOTIONS TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES, AND GOVERNMENT'S MOTION TO COMPEL PRODUCTION OF RECIPROCAL DISCOVERY.

on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electro nically notifies them.

    **1.**      **Knut Johnson, Esq.**
             **Attorney for Defendant Adan Padilla-Vasquez**
    **2.**      **Ellis M. Johnston, Federal Defenders of San Diego, Inc.**
             **Attorneys for Defendant Alfredo Enrique Ramirez-Ayala**

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

    **1.**      **None**

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2008.

                *s/ Lawrence A. Casper*

                LAWRENCE A. CASPER